NOTICE
Decision filed 06/21/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 190188-U

NO. 5-19-0188

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Lawrence County. |
| | ) | |
| v. | ) | No. 18-CF-139 |
| | ) | |
| BRANDON D. EDGIN, | ) | Honorable |
| | ) | Robert M. Hopkins, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WHARTON delivered the judgment of the court.
Justices Cates and Vaughan concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The defendant did not receive ineffective assistance of counsel where there were sound strategical reasons for his trial attorney not to object to testimony by the defendant's former wife referring to the defendant's prior offenses and other bad acts and where the defendant cannot demonstrate prejudice. The court erred in failing to ask all jurors whether they both understood and accepted the first of the Rule 431(b) principles (Ill. S. Ct. R. 431(b) (eff. July 1, 2012)), but plain error review was not warranted where the evidence was not closely balanced.

¶ 2     The defendant, Brandon D. Edgin, appeals his conviction for domestic battery (720 ILCS 5/12-3.2(a) (West 2016)). He argues that (1) he received ineffective assistance of counsel because trial counsel failed to object to the testimony of his former wife alluding to his prior domestic battery conviction, mentioning that his driver's license had been revoked, and describing prior bad acts; and (2) the court committed plain error by failing to fully comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012). We affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4    The incident at issue took place on October 24, 2018, at the home the defendant shared with his then wife, Melissa Edgin. According to Melissa, the defendant threw her against a wall, causing her to hit her head against the wall. According to the defendant, he merely moved Melissa out of the way when she blocked a door to prevent him from leaving the house.

¶ 5    Two days later, the State filed an information charging the defendant with one count of domestic battery (720 ILCS 5/12-3.2(a) (West 2016)). The information alleged that the defendant "knowingly made physical contact of an insulting nature with Melissa Edgin, a family member, in that said defendant grabbed her by the arms with his hands and banged her head against the wall." Due to a prior domestic battery conviction, the offense was charged as a Class 4 felony (*id.* § 12-3.2(b)).

¶ 6    The matter proceeded to trial in April 2019. Prior to jury selection, the court ruled on a motion *in limine* filed by the defendant. The defendant sought to exclude evidence of his prior criminal history, even for purposes of impeaching him as a witness. He acknowledged that because he was charged with felony domestic battery based on the existence of a prior domestic battery conviction, the fact of his prior domestic battery conviction was relevant. However, he argued that proof of the conviction should be limited to a copy of the conviction without any reference to it in trial testimony. The prosecutor agreed that this was the proper method of introducing evidence of the prior conviction and noted that he intended to offer into evidence a certified copy of the defendant's Crawford County plea and judgment of conviction. The court granted the defendant's motion. After jury selection, however, the court ruled that the defendant's prior conviction was a question for the court, not the jury. See 725 ILCS 5/111-3 (West 2018). Thus, the court excluded any evidence of the conviction.

2

¶ 7    The State's first witness was Melissa Edgin. She testified that she married the defendant in 2013 and was married to him for five years. By the time of the trial, they had divorced. Although the Edgins did not have any children together, Melissa had three children from a previous relationship and the defendant had two children from a previous relationship. In October 2018, all five children lived with the Edgins. They ranged in age from 9 to 11 years old.

¶ 8    Melissa testified that she and the defendant initially had a good marriage, but that things changed after the defendant had surgery for carpal tunnel syndrome. She explained that the defendant was unable to work for several months, which led to arguments about finances. She further testified that the defendant's behavior changed after the surgery. She stated, "He turned into a monster." When asked what she meant by this, Melissa explained that the defendant was angry all the time. She testified that he "beat [her] down every day, not physically, but mentally and emotionally," and that he "pretty much told [her she's] not worth anything." She also noted that the defendant began staying away from the house more often.

¶ 9    Melissa further testified that before the defendant had surgery, "he helped all the time." She stated, however, that after the surgery, he did very few household chores, telling her that it was "a woman's job" to do them, "not a man's job." She testified that when the defendant was able to go back to work, he did not help financially. The prosecutor asked, "So would you say he was being irresponsible?" Melissa replied, "Yes, very much so."

¶ 10   Melissa was then asked about the defendant's work schedule. She explained that he worked for a landscaping company in Vincennes, Indiana, and had to be at work early. She noted that she drove him to work, stating, "His license is revoked." She did not specify the reason for the revocation.

¶ 11    The prosecutor next called Melissa's attention to the events of October 24, 2018. She testified that she picked up the defendant from work at approximately 2:30 or 2:45 in the afternoon, Indiana time. When they arrived home, she asked the defendant for money to pay a bill that was "on disconnect notice." The defendant told her he had no money to give her. Melissa explained that she then asked the defendant for his pay stubs "because you have to have pay stubs to get assistance." According to Melissa, the defendant became angry at this point. He swore at her, told her he did not know where his pay stubs were, and suggested she look for them herself.

¶ 12    Melissa testified that she found the defendant's pay stubs and that when she did, she learned that he was making more money than he told her he was making. When she confronted the defendant about this, he got angry. She testified that he "grabbed ahold of" her and threw her against a portion of the kitchen wall that sticks out, causing her to bang her head against the wall. She testified that she "started seeing stars" and fell to the ground after her head hit the wall.

¶ 13    After being thrown against the wall, Melissa told the defendant that she was going to call the police. She testified that she went outside and hid behind the shed, looked up the telephone number of the local police department online, and attempted to place a call three times. However, no one answered the phone.

¶ 14    Melissa testified that she went back inside the house, intending to get her three children and leave. When she returned to the house, however, the defendant was preparing to leave with his two children. According to Melissa, the defendant threatened to kill her and said he would burn the house down with her and her children inside. Despite making these threats, the defendant left the house with his children. The following discussion then took place between the prosecutor and Melissa:

"Q. And *** did he have any plans to leave with the kids for the day ***?

4

A. Not that I'm aware of.

Q. So he just grabbed his kids and left?

A. Well, he has priors. So, he knew with me calling the cops, he would go to jail."

She explained that, eventually, a friend called the sheriff's department for her, and she was able to report the incident.

¶ 15 On cross-examination, defense counsel asked Melissa whether she was already home when the defendant arrived home from work on his own on the day of the incident. Melissa responded, "No. I picked him up. He didn't—he doesn't have a license. His license is revoked. I picked him up if I was home."

¶ 16 Counsel next questioned Melissa about the time period when the defendant stayed home with the children while he was unable to work. The following exchange took place:

"Q. That was with five kids?

A. Yes, five kids.

Q. And you weren't satisfied because he wasn't doing enough chores while he was caring for the children; is that right?"

In response, she stated that the chores were not the only issue. She noted that the defendant also refused to take the children to sports practices. She stated, "I understand he didn't drive. But he wouldn't walk that far."

¶ 17 In response to further questions from defense counsel, Melissa testified that the children were in the kitchen with her and the defendant when the incident occurred, and she left the house to call the police. She stated that she was only outside for "long enough to try to call the police station three different times."

5

¶ 18   On redirect examination, Melissa explained that she left the children in the house with the defendant because she believed that if she "could hurry up and get the cops there," things would be okay. She also noted that although the defendant yelled at the children that day, he was not physically violent to them. Asked to describe her mental state when she went outside to call the police, Melissa stated that she wanted to get help before the defendant killed her. She explained, "I mean, he's bigger than me. Look at him and look at me. And like I said, he's got priors. He's done it before. I'm not the first one—" At this point, the court interrupted and told her to "just answer the questions."

¶ 19   Officer Mike Seitzinger testified that he was dispatched to the Edgins' home on October 24, 2018. When he arrived, Melissa Edgin appeared to be shaken and nervous. When Officer Seitzinger asked her what happened, she told him that she confronted her husband, the defendant, about not paying bills. She further told him that the defendant "grabbed her by the arm and put her up against the wall, causing her to bang her head." She also told him that a glass had broken during the incident.[1]

¶ 20   Officer Seitzinger testified that he observed a red mark on Melissa's right arm. He explained that the shape of the mark appeared to be "from fingers," which was consistent with her story. Officer Seitzinger identified a photograph he took of the mark on Melissa's arm, which was admitted into evidence. He testified that he was unable to take a picture of the broken glass Melissa had mentioned because she swept it up before he arrived. She told him she did this because she did not want her children to cut themselves on it.

---

[1]We note that Melissa did not mention the broken glass in the account of events she gave during her direct testimony. When questioned about her statement by defense counsel, she acknowledged telling Officer Seitzinger that there was broken glass. She explained that the glass came from a picture frame, and she noted that she may have remembered more about the incident immediately after it happened than she did by the time of the trial. She testified, however, that both her statement to police and her testimony at trial were true.

¶ 21 Officer Seitzinger further testified that Melissa showed him the call log on her cell phone. He confirmed that it showed she placed three calls to the police department's non-emergency phone number. The first call was placed at 3:59 p.m.

¶ 22 On cross-examination, Officer Seitzinger was asked whether he observed any other bruises or any knots on Edgin's head. He testified that he did not observe any such injuries.

¶ 23 The defendant's mother, Tracy Edgin, testified on his behalf. She testified that the defendant brought his two children to the library, where she worked, at 3:45 p.m. on October 24, 2018. She stated that he told her that he was leaving his wife and he asked her to take the children to her house overnight so she could bring them to school in the morning. She explained that the defendant, who did not drive, was able to get a ride to Vincennes that evening, so he would be there in time for work early the next morning. As such, he would not be available to take the children to school in the morning. On cross-examination, Tracy acknowledged that she could have driven the defendant to work in the morning. She stated that she did not know why he decided to go to Vincennes that evening instead of asking her for a ride.

¶ 24 The defendant testified that he cared for all five children during an eight-month period when he was unable to work due to the surgery for carpal tunnel syndrome. He returned to work on October 1, 2018, and received two paychecks before the incident at issue occurred. When asked what he did with them, he testified that the first check "went to [his] mother" to repay her for paying bills for him and Melissa while he was not working. He further testified that he had most of the money from the second check in his wallet when he left after the incident.

¶ 25 The defendant was next asked to describe the events of October 24, 2018. He testified that he drove himself home from work, arriving at 2:45 in the afternoon. He "kicked back" on the couch because his back hurt. Initially, he thought Melissa was not home, but he soon realized that she

7

was in the basement. According to the defendant, Melissa came upstairs and began yelling at him "about all sorts of different stuff," including money. He testified that she left the house, went to the county treasurer or some county office, and returned home approximately 10 minutes later.

¶ 26    The defendant testified that upon her return, Melissa continued to argue with him, yell at him, and act "hostile" toward him. He stated that he went outside and sat on the front steps to wait for the children to come home from school. Melissa followed him outside and told him that she thought he was going to leave "because that's what I do best is just leave." According to the defendant, he assured her that he was just waiting for his children to get home from school.

¶ 27    The children arrived home at approximately 3:35 p.m. The defendant testified that at this time, he told his two children to get their things and went back inside the house with them. His intent was to leave with his children.

¶ 28    The defendant described what happened when he attempted to leave as follows: "She blocked the doorway and was trying to keep me and my kids from exiting the house, but I moved her out of the way." Asked to clarify, he stated, "I put my arm in front of her and pushed her backward just a little bit so we could get through. That was all I did." He denied shoving Melissa against a wall. When asked if he did anything that might have left a mark on Melissa, he replied, "No. Not that I'm aware of." Although he denied it was possible that he grabbed Melissa's arms hard enough to make a mark, he conceded that he may have bumped her hard enough to cause a mark.

¶ 29    The defendant testified that after leaving the house, he walked to the library with his children. He left them with his mother while he went to Vincennes so he would be there in time to begin work at 5:30 the next morning, Illinois time.

8

¶ 30    On cross-examination, the defendant testified that Melissa accused him of cheating on her, but they did not argue about money. He acknowledged, however, that he had specifically testified during direct examination that one of the things Melissa yelled at him about was money. The prosecutor asked, "Didn't you just testify that you didn't have money problems?" The defendant replied, "I—that wasn't an issue primarily. That wasn't the issue of why we were fighting."

¶ 31    The defendant further testified that he called a friend to give him a ride to Vincennes. That friend dropped him off at his workplace. The defendant explained that he called his boss during the ride to Vincennes, and his boss picked him up at his workplace and drove him to a motel where he spent the night.

¶ 32    The jury found the defendant guilty. The defendant filed a motion for a new trial, which the court denied. The court sentenced the defendant to 30 months in prison. This appeal followed.

¶ 33                                II. ANALYSIS

¶ 34                        A. Ineffective Assistance of Counsel

¶ 35    The defendant first argues that his trial attorney was ineffective for failing to object to three different categories of testimony provided by his former wife, Melissa Edgin. Specifically, he contends that counsel should have objected to (1) testimony that he had "priors," (2) testimony that his driver's license had been revoked, and (3) testimony describing other negative conduct in the months leading up to the incident. We reject these contentions.

¶ 36    We evaluate claims of ineffective assistance of counsel using the two-prong test established by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by the Illinois Supreme Court in *People v. Albanese*, 104 Ill. 2d 504 (1984). Under that test, a defendant must show both that his counsel's performance was deficient and that the defendant suffered prejudice as a result. *Strickland*, 466 U.S. at 687. To demonstrate deficient performance,

9

the defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Id*. at 687-88. To demonstrate prejudice, a defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

¶ 37    This showing requires him to overcome a strong presumption that counsel's decisions constituted sound trial strategy. *Id*. at 689. Trial strategy includes decisions such as when to make an objection. *People v. Pecoraro*, 144 Ill. 2d 1, 13 (1991). One reason an attorney might decide not to object to inadmissible testimony is to avoid drawing attention to it. See, *e.g.*, *People v. Evans*, 209 Ill. 2d 194, 221 (2004). Thus, counsel's decision not to object to improper testimony "does not necessarily establish substandard performance." *People v. Graham*, 206 Ill. 2d 465, 478-79 (2003).

¶ 38    The defendant first challenges counsel's decision not to object to Melissa's testimony that he had "priors." As discussed previously, she mentioned the fact that the defendant had "priors" twice during her testimony without objection. The first time, she stated that the defendant knew he would likely spend time in jail when she called the police because he had "priors." Although she did not specify what she meant, the statement at least implied that the defendant had prior criminal convictions. The second reference came in response to questions concerning Melissa's decision to leave her children in the house with the defendant while she went outside to call the police. She testified that she just wanted to get the police there as soon as possible before the defendant had a chance to kill her. This time, in addition to stating that the defendant had "priors," Melissa specifically testified, "He's done it before. I'm not the first one." She did not provide any details, however.

10

¶ 39　The defendant argues that it was improper for the State to elicit this testimony in violation of the court's *in limine* ruling. See *People v. Eghan*, 344 Ill. App. 3d 301, 313 (2003). He further argues that counsel's failure to object was unreasonable because an objection would have protected the defendant from the prejudicial effect of the testimony. See *People v. Irwin*, 2017 IL App (1st) 150054, ¶ 54 (explaining that a timely objection to testimony that violates an *in limine* ruling can cure the error if the objection is sustained). We disagree.

¶ 40　As discussed earlier, declining to object to inadmissible testimony may be a strategically sound way to avoid calling attention to the testimony. See *Evans*, 209 Ill. 2d at 221. We also believe there was an additional strategic reason to forego an objection. Although evidence of prior criminal offenses is generally not admissible for the purpose of demonstrating the defendant's propensity to commit crimes (*People v. Illgen*, 145 Ill. 2d 353, 364 (1991)), our legislature has created an exception to this general rule for cases involving domestic violence. By statute, evidence of a defendant's previous domestic batteries may be admitted for any relevant purposes. 725 ILCS 5/115-7.4 (West 2018). Evidence concerning the factual details of prior incidents is admissible, not just the fact of a prior conviction. See *People v. Chambers*, 2011 IL App (3d) 090949, ¶ 17. Because a court can revisit its ruling on a motion *in limine* as the trial unfolds (see *People v. Zimmerman*, 2018 IL App (4th) 170695, ¶ 149), an objection to the testimony might have prompted the prosecution to ask the court to reconsider its ruling and admit evidence concerning the underlying facts of the defendant's prior domestic battery conviction, details that may well have been more prejudicial than two brief mentions of the defendant having "priors."

¶ 41　It is worth mentioning that even when other-crimes evidence is admissible, the trial court must still weigh its probative value against the potential for prejudice. If the potential for prejudice substantially outweighs the probative value, the court should exclude the evidence. *Illgen*, 145 Ill.

2d at 365. Here, it does not appear that the court engaged in this balancing because the parties agreed that the evidence was inadmissible. Thus, it is not certain that the court would have admitted evidence concerning these details had the State asked the court to revisit the *in limine* ruling.

¶ 42    Nevertheless, we agree with the State that defense counsel may have decided that an objection to Melissa's brief and nonspecific references to the defendant's "priors" would have drawn attention to the testimony and that an objection could have led to the admission of evidence with a greater potential for prejudice. A defendant asserting ineffective assistance of counsel can overcome the presumption that his attorney's decisions constituted sound trial strategy only by showing that those decisions were "so irrational and unreasonable that no reasonably effective defense attorney, facing similar circumstances, would pursue such a strategy." *People v. Jones*, 2012 IL App (2d) 110346, ¶ 82. For the reasons we have discussed, we find that the defendant is unable to meet that standard here.

¶ 43    The defendant next challenges defense counsel's decision not to object to Melissa's testimony that his driver's license was revoked. He argues that this testimony constitutes evidence of other crimes because the 48 bases available for revocation of a driver's license all "involve some type of unlawful driving or fraud." See 625 ILCS 5/6-206 (West 2016). The defendant contends that an objection to the testimony likely would have been sustained, both because it violated the *in limine* ruling prohibiting testimony about the defendant's other offenses and because other-crimes evidence is generally inadmissible unless relevant for some purpose other than to show propensity to commit crime. See *Illgen*, 145 Ill. 2d at 364-65. The defendant further argues that his trial counsel was ineffective for failing to object to two references Melissa made to the revocation of his license in response to questioning by the prosecutor and for eliciting an additional reference in response to his own question. We are not persuaded.

12

¶ 44    We first note that we believe the defendant mischaracterizes the record when he asserts that his attorney "elicited" testimony from Melissa concerning the revocation of his license. As we discussed earlier, counsel asked Melissa whether she was really at home when the defendant arrived home from work on his own on the day of the incident. Counsel was likely aware that his client would testify that he drove himself home from work.

¶ 45    We next note that, contrary to the defendant's contention, there are reasons a person's driver's license might be revoked that do not involve crimes or fraud. For example, a person's license may be revoked because he or she is involved in multiple vehicle accidents "to a degree that indicates" the driver lacks the ability to drive safely (see 625 ILCS 5/6-206(a)(3) (West 2016)) or because the driver fails to pass a driver's test (see *id.* § 6-206(a)(7)).

¶ 46    Most importantly, however, we believe that an objection would only have served to draw attention to these isolated references. As we have already discussed, the decision to forego an objection for this reason constitutes sound trial strategy. See *Evans*, 209 Ill. 2d at 221.

¶ 47    Finally, the defendant challenges counsel's failure to object to Melissa's testimony about his noncriminal bad conduct. As discussed earlier, Melissa testified at some length about the problems in her marriage to the defendant in the months leading up to the incident. She testified that he did not help with household chores or take the children to sports practices, and she testified that he was often angry and that he "beat her down emotionally." The defendant argues that his attorney provided ineffective assistance by failing to object to this testimony. We reject this contention.

¶ 48    Like evidence of prior criminal offenses, evidence of other wrongs or bad acts is not admissible unless it is relevant for some purpose other than showing the defendant's propensity to commit an offense. *People v. Jaynes*, 2014 IL App (5th) 120048, ¶ 55. Evidence is relevant if it

has a tendency to make the existence of any material fact more or less probable than it would be without the evidence. Even where evidence of other bad acts is relevant, "it must not become the focal point of the trial." *Id.* "A danger exists that evidence of other bad acts will persuade the jury to convict the defendant because it feels that the defendant is a bad person deserving of punishment." *Id.*

¶ 49 At least some of the testimony at issue was relevant to explain the events at issue. Had Melissa testified that the defendant simply came home from work one day and threw her against a wall, her account would have made little sense, and the defendant would almost certainly have attacked her credibility on this basis. We note that the credibility of a witness is always a relevant consideration. *People v. Trice*, 2017 IL App (4th) 150429, ¶ 55. However, we agree with the defendant that the State presented more testimony than was necessary concerning the defendant's behavior during the months leading up to the argument.

¶ 50 We need not consider whether counsel's decision not to object was professionally unreasonable, however. A defendant must satisfy both prongs of the *Strickland* test to prevail on a claim of ineffective assistance of counsel. *People v. Morris*, 2013 IL App (1st) 110413, ¶ 62. Thus, as discussed earlier, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In determining whether the defendant has made this showing, we must consider the cumulative effect of his attorney's asserted errors. See *People v. Vera*, 277 Ill. App. 3d 130, 141 (1995); *People v. Bell*, 152 Ill. App. 3d 1007, 1019 (1987). We do not believe the defendant can make the required showing in this case.

¶ 51 In support of his argument to the contrary, the defendant points out that the jury sent a note to the court during deliberations asking whether the defendant had a prior domestic battery

14

conviction. He argues that this demonstrates prejudice because it indicates that jurors were focused on Melissa's testimony that he had "priors." As we explained earlier, however, this testimony was admissible and, had counsel objected, details concerning the underlying facts of his prior conviction might have been admitted.

¶ 52 Moreover, as we will explain in more detail in the next section of this decision, the evidence of the defendant's guilt was quite strong. Melissa's account was supported by evidence of the finger-shaped mark on her arm and by the fact that her testimony was consistent with her statement to police on the day of the incident. In addition, the defendant acknowledged pushing Melissa out of the way. As we will also discuss in more detail later, this admission alone was sufficient to support a finding that the defendant made contact of an insulting or provocative nature with Melissa. That was all the jury needed to find to return a verdict of guilty. See 720 ILCS 5/12-3.2(a)(2) (West 2016). In the face of this evidence, the defendant cannot demonstrate a reasonable probability that the result of the trial would have been different had defense counsel objected to Melissa's testimony. We thus reject his claim of ineffective assistance of counsel.

¶ 53                                                      B. Rule 431(b)

¶ 54 The defendant next argues that the court did not fully comply with the requirements of Illinois Supreme Court Rule 431(b) during *voir dire*. He acknowledges that his attorney failed to object, thereby forfeiting this argument. However, he asks us to consider his claim under the plain error doctrine. We decline to do so.

¶ 55 Rule 431(b) requires courts to question prospective jurors as to their understanding and acceptance of the following four principles of law: (1) the defendant is presumed to be innocent of the charges against him, (2) the defendant is not required to offer any evidence, (3) the State must prove the defendant guilty beyond a reasonable doubt, and (4) jurors may not draw any negative

15

inferences if the defendant chooses not to testify. *People v. Thompson*, 238 Ill. 2d 598, 606 (2010) (quoting Ill. S. Ct. R. 431(b) (eff. May 1, 2007)). No precise words are required to satisfy the rule. *People v. Ware*, 407 Ill. App. 3d 315, 356 (2011). In addition, the court may question the prospective jurors either individually or in a group. However, every juror must have the opportunity to respond to questions about whether they both understand and accept each of these four principles. *Thompson*, 238 Ill. 2d at 607.

¶ 56    The defendant argues that most of the jurors were never asked whether they understood the first principle. As noted previously, however, he forfeited review of this claim by failing to object during *voir dire*. See *People v. Belknap*, 2014 IL 117094, ¶ 47. Thus, we may only consider his claim under the plain error doctrine, which permits us to consider claims that are otherwise forfeited if either (1) "the evidence was so closely balanced that the error alone threatened to tip the scales of justice against the defendant" or (2) the error was so serious that it undermined the fairness of the defendant's trial and "the integrity of the judicial process." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Before determining whether plain error review is appropriate, however, we must first consider whether error occurred at all. *Ware*, 407 Ill. App. 3d at 354. Without error, there can be no plain error. *People v. Hood*, 2016 IL 118581, ¶ 18.

¶ 57    Here, all 12 jurors were chosen from the first panel of 14. After explaining the first principle to the group, the court asked the first prospective juror, "But to state it simply, Ms. Judy, do you understand the principle that a defendant is presumed innocent of the charge against him or her?" After the prospective juror answered in the affirmative, the court asked her, "And if selected, can you follow that?" She indicated that she could do so. The court asked the second prospective juror, "Same questions, Mr. Swarens." After receiving an affirmative response, the court asked the third prospective juror, "Can you follow and apply that?" The court questioned the remainder of the

16

panel by saying, "Same questions," or by simply calling upon them by name. The defendant argues that the phrase "same questions" logically applies to the court's questions to the third prospective juror, who was asked if he could follow and apply the principle, but was not asked if he understood it. Thus, the defendant contends, only the first two jurors were asked whether they understood the first principle.

¶ 58    As stated previously, no precise language is mandated by Rule 431(b). See *Ware*, 407 Ill. App. 3d at 356. Thus, the question is whether "follow and apply" carries the same meaning as "accept and understand." Illinois appellate courts have repeatedly found that asking prospective jurors if they are willing to follow the 431(b) principles can be understood as asking if they accept the principles. See, *e.g.*, *People v. Hartfield*, 2020 IL App (4th) 170787, ¶ 58, *reversed on other grounds*, 2022 IL 126729, ¶ 96; *People v. Atherton*, 406 Ill. App. 3d 598, 611 (2010); *People v. Willhite*, 399 Ill. App. 3d 1191, 1196 (2010). As the defendant correctly argues, however, courts must also ask whether prospective jurors understand the four principles. He contends that the phrase "follow and apply" is insufficient to convey this meaning.

¶ 59    In support of its argument to the contrary, the State calls our attention to *People v. Joseph*, 2021 IL App (1st) 170741. There, the First District interpreted similar language—asking whether prospective jurors "can apply" the principles—to mean the same thing as asking whether they understood the principles. *Id.* ¶¶ 36-39.

¶ 60    In *Joseph*, the trial court explained the four principles to the prospective jurors. After explaining each principle, the trial judge asked the prospective jurors to raise their hands if they had "any quarrel with" the principle he had just explained. *Id.* ¶ 24. He then gave them a hypothetical illustration. *Id.* ¶ 25. After that, the court asked the prospective jurors, as a group, "Is

17

there anybody here who cannot apply those four propositions in the manner that I have indicated?" *Id.* ¶ 26.

¶ 61 At this point, the defendant interrupted to tell the judge that he did not hear everything that had been discussed. *Id.* ¶ 27. The judge had a conversation with the defendant in which he explained his questioning of the prospective jurors. Then, the court again asked if any prospective jurors "could not apply those four propositions in the manner [the court had] indicated." *Id.* The court asked for a show of hands. After noting that none of the prospective jurors raised their hands in response, the court stated: "*Then I take it that all of you accept and understand these four propositions of law*. If that's not the case, raise your hand." (Emphasis in original.) *Id.*

¶ 62 On appeal, the defendant argued that this final question was inadequate to satisfy the requirements of Rule 431(b) because jurors were not questioned about each principle individually. The First District rejected this contention, pointing to our supreme court's decision in *People v. Birge*, 2021 IL 125644, which had been decided while *Joseph* was pending on appeal. *Joseph*, 2021 IL App (1st) 170741, ¶ 31 (explaining that, in *Birge*, the supreme court held that Rule 431(b) does not require trial courts to explain and question jurors on the four principles separately (citing *Birge*, 2021 IL 125644, ¶¶ 34, 41)). The *Joseph* court went on to state, however, that after the defendant's interruption, prospective jurors "may have lost the thread of the conversation." *Id.* ¶ 33. The court therefore considered whether the trial court's questions prior to that point satisfied the requirements of Rule 431(b). *Id.* ¶ 34.

¶ 63 In answering this question, the First District reiterated that "after confirming the jurors' acceptance" of the principles, the trial judge gave them a hypothetical and asked whether any of them were unable to apply the four principles in the manner indicated in the hypothetical. *Id.* ¶ 35. The defendant argued that this was simply another way of asking whether the prospective jurors

18

accepted the four principles. In rejecting this argument, the First District stated, "While not entirely free of ambiguity, the most natural interpretation of that question, *in context*, was that the trial court was asking whether the jurors understood how the [Rule 431(b)] principles worked in practice." (Emphasis added.) *Id.* ¶ 36.

¶ 64 The *Joseph* court next acknowledged that "[a]sking whether someone 'can apply' a principle *could* be interpreted as asking whether they are willing to do so." (Emphasis in original.) *Id.* ¶ 38. The court concluded, however, that this "is not the most natural meaning, and particularly not in this context." *Id.* ¶ 39. The court emphasized that the trial court "did not simply ask the bald question" of whether the prospective jurors could apply the principles, but instead asked whether they could apply the principles in the manner indicated by the judge in his hypothetical illustration. *Id.*

¶ 65 The instant case is distinguishable from *Joseph*. Here, the court did not also explicitly ask whether all prospective jurors "understood" the principles. Moreover, the court did not lay out a hypothetical illustration and ask whether the panel could apply the four principles in the manner described. Thus, the context emphasized by the *Joseph* court was not present here. Absent that context, we find that the trial court did not clearly ask all the jurors whether they understood the first principle. We agree with the defendant that this was error.

¶ 66 Having concluded the court erred, we must consider whether plain error review is warranted. The defendant argues that plain error review is appropriate because the evidence in this case was closely balanced.[2] We disagree.

---

[2]We note that the defendant does not seek review under the serious-error prong of the plain error rule. As he acknowledges, our supreme court has held that review of Rule 431(b) errors is not appropriate under that prong unless the error actually resulted in a biased jury. *People v. Sebby*, 2017 IL 119445, ¶ 52.

¶ 67    It is the defendant's burden to persuade this court that the evidence was closely balanced. *Thompson*, 238 Ill. 2d at 613; *Piatkowski*, 225 Ill. 2d at 567. Whether evidence is closely balanced is a different question than whether the evidence was sufficient to support the defendant's conviction beyond a reasonable doubt. *Piatkowski*, 225 Ill. 2d at 566. The question is whether the evidence is so closely balanced that "the error alone severely threatened to tip the scales of justice." *People v. Sebby*, 2017 IL 119445, ¶ 51.

¶ 68    In answering that question, we engage in a common-sense evaluation of the evidence. *Id*. ¶ 53; *Belknap*, 2014 IL 117094, ¶ 50. We must consider the totality of the evidence presented. *Sebby*, 2017 IL 119445, ¶ 53. In evaluating the strength of the evidence, we must consider both "the quantum and quality" of evidence. See *Piatkowski*, 225 Ill. 2d at 571. Applying these principles, we reject the defendant's contention that the evidence in this case was closely balanced.

¶ 69    The defendant argues that the evidence was closely balanced because this case involved a contest of credibility between his version of events and Melissa's. See *id*. at 570; *People v. Garza*, 180 Ill. App. 3d 263, 269 (1989). His argument overlooks two key points.

¶ 70    First, as we have just discussed, we must consider "the quantum and quality" of evidence in evaluating its closeness. See *Piatkowski*, 225 Ill. 2d at 571. Here, there was substantial evidence to support Melissa's account of the events at issue. Her testimony was consistent with the statement she gave to Officer Seitzinger on the day of the incident, and Officer Seitzinger observed and photographed a mark on her arm that was consistent with her account of being grabbed by the defendant. That photograph was entered into evidence. Although Tracy Edgin's testimony provides some support for the defendant's account of what occurred after the incident, Tracy was not present when the incident occurred, and the only aspect of Melissa's testimony contradicted by Tracy's was the timing of the incident.

20

¶ 71    Second, and perhaps more importantly, as we discussed earlier, the defendant's version of events did not exonerate him. The defendant was charged with knowingly making physical contact of an insulting or provocative nature with a family member by grabbing Melissa's arms with his hands. See 720 ILCS 5/12-3.2(a)(2) (West 2016). Although he denied shoving her into a wall or grabbing her hard enough to leave a mark on her arm, he acknowledged making physical contact and pushing her back from where she stood. He further admitted that he may have bumped Melissa hard enough to cause the mark observed by Officer Seitzinger. Reasonable jurors could have found that even the type of contact the defendant admitted to was "insulting or provocative." Thus, they could have found the defendant guilty even if they determined his testimony was more credible than Melissa's. We thus conclude that the evidence was not closely balanced. We therefore decline to review the defendant's claim under the plain error doctrine.

¶ 72                                III. CONCLUSION

¶ 73    For the foregoing reasons, we affirm the defendant's conviction.


¶ 74    Affirmed.