NOTICE

Decision filed 07/19/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 210393-U

NO. 5-21-0393

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 20-CF-1757 |
| | ) | |
| JOHN W. WEBB, | ) | Honorable |
| | ) | Ronald R. Slemer, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Cates and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's judgment is affirmed where defendant's claim of ineffective assistance of trial counsel failed to meet either *Strickland* prong.

¶ 2    Defendant, John W. Webb, appeals from his convictions and sentence. He contends that his trial counsel was ineffective for failing to object to hearsay provided by one of the State's witnesses at trial. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On August 10, 2020, defendant was charged, by information, with three counts. The first count charged predatory criminal assault of a person under the age of 13 in violation of section 11-1.40(a)(1) of the Criminal Code of 2012 (720 ILCS 5/11-1.40(a)(1) (West 2020)) and alleged that defendant inserted his penis into the mouth of J.T. The remaining two counts charged defendant

1

with aggravated criminal sexual abuse of a person under the age of 13 in violation of section 11-1.60(c)(1)(i) of the Criminal Code of 2012 (*id.* § 11-1.60(c)(1)(i)). Count II alleged that defendant touched J.T.'s sex organ with his hand for the purpose of sexual arousal or gratification. Count III alleged that defendant rubbed his penis against J.T.'s butt for the purpose of sexual arousal or gratification.

¶ 5　　On April 29, 2021, defense counsel filed a motion requesting the court to order the State to disclose and describe the evidence related to other crimes and bad acts it intended to use under Illinois Rule of Evidence 404(b) (eff. Jan. 1, 2011). At the hearing on the motion, the State explained there was a prior investigation of defendant in February 2019 involving J.T. and similar allegations. That investigation did not result in any charges and the Department of Children and Family Services (DCFS) found the investigation "unfounded." The State argued that it was not attempting to hide the fact that there were no charges as a result of the first investigation but requested preclusion of the fact that DCFS found it "unfounded," because DCFS standards for investigations differed from the standard used in the criminal justice system and would confuse the jury. It reiterated that it did not want to hide the fact that nothing happened after the first investigation but wanted to preclude the language of "unfounded." Defense counsel argued that if he was not allowed to speak to the DCFS finding, the State should not be able to present the previous investigation. The court found the State complied with Rule 404(b). It further determined that there was no reason to have a decision made by an agency interfere with the jury's ability to make their own determinations of the facts and therefore barred the findings made by DCFS. However, the fact that DCFS and the Granite City police conducted investigations in 2019 and 2020 was deemed admissible. The court also asked about defendant's prior convictions and the State indicated they were too old to be used for impeachment and had no intention of using them.

2

¶ 6    On July 28, 2021, defense counsel filed his first motion *in limine* and motion to redact video statements related to defendant's illegal drug use arguing the statements were too prejudicial to allow before the jury. The motion was heard at the August 9, 2021, pretrial conference. The State agreed to redact those statements from the video and stated that if defendant testified it would use the statements as impeachment evidence.

¶ 7    Venita McKnight, the wife of defendant, testified that she had two children. One was Stephanie, who produced three grandchildren, including J.T., the alleged victim. J.T. was currently 7 years old and was 6 years old in August 2020. Venita and defendant would regularly watch the grandchildren, who would occasionally spend the night. They usually slept on an air mattress, but it was broken on August 7, 2020, and therefore two of the children were sleeping on the couch. J.T. woke around midnight and advised Venita that she wet herself. Venita cleaned up J.T., put her in different pajamas, and around 1 a.m., put J.T. back on the couch after determining there were no leaks on the couch. Venita did not know where defendant was at that time as he had been drinking that night and was in and out of the house. Venita was awakened later in the night around 3:50 a.m. and saw defendant on top of J.T. He was riding J.T. like he was on a mechanical bull. She jumped off the bed and asked defendant what he was doing. Defendant got up and said he was "doing nothing" and was just "tucking her in." After Venita asked defendant what he was doing, she snatched J.T. and took her to the bathroom and asked J.T. to tell her what defendant did to her. J.T. stated defendant was riding her. She seemed scared and nervous. Venita then took J.T. back out of the bathroom and had J.T. show her what defendant was doing. J.T. climbed up on Venita and demonstrated what defendant had been doing. Venita told defendant to leave and called her daughter Brianna and asked her to come over. Defendant left. Venita told Brianna what happened,

and Brianna got mad and started crying. She told Venita to call the police. Venita called 911 around 4:15 a.m. The 911 call was played for the jury.

¶ 8 Venita stated this was not the first incident and testified about J.T.'s mother, Stephanie, calling her about a year earlier and telling her that J.T. said defendant inappropriately touched her. She did not leave defendant at that time because she was unsure about the allegation, she loved defendant, and he was a good provider. She stated that the police were called about that incident, but no charges were brought. Stephanie stopped bringing the children over for a while but eventually brought them back because Stephanie got a job and did not want anyone else but Venita to watch her children. Stephanie's shift was at night, which was why the children spent the night at Venita's house.

¶ 9 On cross-examination, Venita stated that she and defendant got the apartment together. She watched all her grandchildren; three of Stephanie's and one of Brianna's. She stated that on the day of the incident, she took her water and blood pressure pills in the morning. She also took medication for allergies. She disputed taking 10 medications that day. She agreed that some of the pills made her groggy and that was why she took J.T. into the bathroom to make sure she had not seen something wrong when she woke up.

¶ 10 As to the first incident, Venita remembered that it was a year earlier but was unsure of the exact date. She agreed that she was not allowed to have the children around defendant during the first DCFS investigation which ended in the summer of 2019. She stated that DCFS found the allegations were unfounded and therefore Venita was allowed to have the grandchildren at her house. As to the August 2020 incident, Venita stated that J.T. was lying on her side facing away from the couch when she saw her. She did not remember where either of defendant's hands were. J.T. spoke with DCFS after the incident and then they were sent to a hospital in St. Louis.

4

¶ 11     Brianna McKnight is Venita's daughter. She received a phone call from her mother around 4 a.m. on August 7, 2020. Her mother told her to come over and she went to her mother's house alone. After Brianna spoke with her mother, she spoke with J.T. and J.T. told her that defendant was on top of her going up and down and she told him to get off her, but he would not. She said that J.T. was scared. Brianna was upset, so she called her boyfriend and left to go get him. She saw defendant when she was going back to her mother's house, and when she asked what was going on, he said, "nothing" and "I was just tucking her in." She said that defendant seemed anxious and scared when she saw him. She stated that she was aware of the prior incident in which J.T. said defendant touched her.

¶ 12     On cross-examination, Brianna stated that she had a one-year-old child, whom Venita also watched. She stated that her boyfriend did not have a gun. She did not think defendant was drunk when she spoke with him. She agreed that no charges were brought regarding the 2019 incident because J.T. changed her story. She agreed that her mother took medication and some of it made her drowsy.

¶ 13     Sergeant Ryan Jones, a patrol officer for the Granite City Police Department, testified that on August 7, 2020, they received a call about a potential criminal sexual assault and the suspect was wearing a white t-shirt and jeans. He saw the suspect, who was defendant, while en route to where the incident occurred. Defendant told him that he came from the house where the officer was headed and disputed what the family was saying that he did. Defendant agreed to come back to the house and the officer put him in the back of the police vehicle. He did not ask defendant any questions while he was in the car, but the video recorder was activated in the car as per department policy. Later in the day, after the defendant was taken to the Granite City Police Department, Sgt. Jones looked at the video from the car and found that defendant talked to himself while he was in

the back of the police vehicle. The video and audio recordings were shortened to remove the dead space and five videos were published by agreement to the jury. After the tapes were complete, Sgt. Jones clarified that defendant twice stated, "I shouldn't have been on top of her like that." One of the other videos showed defendant stating this was not the first time and they did not like him over there. On cross-examination, Sgt. Jones said that he did not hear defendant say that he should have let J.T. fall off the couch after he said he should not have been on top of her.

¶ 14    Sgt. Eric Stacy, also a patrol officer with the Granite City Police Department and a detective for the sex crime cases, testified that when he reported for work on August 7, 2020, he was advised of the current case. He was told defendant's wife found defendant on top of the child, there was audio from the back of a police car, interviews had been performed, and photographs had been taken. He clarified that Venita and Brianna had been interviewed. J.T. was taken to Cardinal Glennon Children's Hospital because all child victims were recommended to go there for an evaluation. No sexual assault kit was obtained because there was no allegation of penetration. The allegations were defendant rubbing his penis on J.T.'s butt. J.T.'s clothes, defendant's clothes, and J.T.'s blanket were collected for DNA evidence. No semen was found on the evidence. The officer was not surprised by the lack of DNA evidence since the interviews indicated that defendant was caught in the act before ejaculation. During his investigation, Sgt. Stacy learned of a prior incident involving the same parties from 2019. That report was made with the Venice Police Department by J.T.'s mother, Stephanie.

¶ 15    He agreed that J.T. was interviewed at Madison County Child Advocacy Center (MCCAC) on March 6, 2019. At that time, J.T. told the interviewer that defendant had touched her butt and her "burger" with his finger. J.T. identified her vagina as the "burger." She was five years old at the time and was taken to Cardinal Glennon following that incident as well. No sexual assault kit

6

was obtained then either for the same reasons. The mother provided a written statement for the Venice Police Department. Venita was not interviewed for the 2019 investigation and no charges were ever filed against defendant. Sgt. Stacy testified that it was rare for charges to be filed when it involved two people who knew each other because it was a "he said/she said" case and with no witnesses, there was insufficient evidence.

¶ 16    Sgt. Stacy set J.T. up an interview at MCCAC for the current case for August 19, 2020. He explained that the MCCAC performs the interview and the officers, DCFS, and state's attorneys can watch but do not participate in the interview, so that the child does not have to be interviewed multiple times. He agreed that it would be traumatic for the victim to have to be interviewed multiple times. J.T.'s interview was performed over Zoom due to Covid-19 restrictions. Sgt. Stacy testified that J.T. provided disclosures of sexual abuse during the interview that included defendant getting on top of her, taking his penis out, and pushing it on her. He also attempted to kiss her. J.T. also disclosed that defendant asked her to kiss his penis, she kissed his penis, and that he had peed in her mouth one time.

¶ 17    Sgt. Stacy also interviewed defendant after Mirandizing him. Defendant's emotions ranged from calm to animated during the interview. Defendant maintained that he was only tucking J.T. in but changed his description of how he tucked J.T. in. He did not make any admissions during the interview. He stated that this happened because his wife wanted him out of the house because she did not trust him anymore and this was all made up so she could get rid of him. Sgt. Stacy did not believe that Venita kicked defendant out after the first incident.

¶ 18    On cross-examination, Sgt. Stacy denied listening to the video from the police car and stated that no one told him that defendant said he should have let the child fall off the couch after he said he should never have gotten on top of her. He agreed the sexual assault kit was a very

7

invasive examination and was not done in all instances. He further agreed that no DNA evidence was obtained in this case. Sgt. Stacy agreed there were instances when a victim made up a story, was cajoled by someone to tell a story, or changed the story. He did not know if that occurred in the 2019 incident because he did not investigate that case. He agreed that the first time he learned that defendant had J.T. kiss his penis and peed in her mouth was during the MCCAC interview. He could not recall J.T. saying that defendant put his penis in her butt during the MCCAC interview and did not recall that allegation arising before trial. He could not remember if Venita told him during her interview that she took 10 pills the day of the incident. Defense counsel played the clip from the interview with that statement. Sgt. Stacy did not know if the youngest grandchild was interviewed on August 7, 2020. He knew there was an age that was too young to interview at MCCAC but did not know what it was.

¶ 19    On redirect, Sgt. Stacy agreed that the youngest grandchild in the home on August 7, 2020, was now three years old. He further stated that he found no evidence that J.T. was cajoled into providing the current allegations.

¶ 20    Pursuant to a stipulation, the State read a portion of the Cardinal Glennon medical records into the record that included a statement made by J.T. to the hospital personnel on February 11, 2019. The statement was made to a social worker who asked J.T. what she told her mother. J.T. initially told the social worker that she would have to ask her mother. The social worker told her that she would talk to her mother, but wanted to know if there was anything J.T. wanted to share. J.T. asked if she could speak to her mother. Her mother assured her that she could speak with the social worker, and when she returned, J.T. pointed to her vagina and said that defendant touched her "right there." The social worker asked if defendant touched her there with his foot, his hand, or something else. J.T. said, "His hand, like he always does, but I don't know where he learned

that." She stated that defendant also liked to touch her "back there" and pointed to her butt. J.T. asked to go back to her mom and the social worker returned her to her mother.

¶ 21    The State read a second portion of the records from August 7, 2020, involving a different social worker. At that time, J.T. reported that she had woken up and her granddaddy was riding her like a horse. Her granny caught him and now he was in jail. When the social worker asked if her granddaddy touched her anywhere, J.T. said no. She said he was wearing shorts at the time. When asked if this happened before, J.T. said yes, but could not remember when.

¶ 22    The State also read a report from Dr. Linda Shaw from September 22, 2020. Dr. Shaw noted bumps on J.T.'s lower lip and mouth. J.T. stated defendant had kissed her and put his private in there when he peed. J.T. also told Dr. Shaw that defendant had her kiss his front private, and it almost made her puke. J.T. stated that he had not made her bleed, but his bites made her bleed. She also stated that his private part made it hard to pee and poop. She said she felt mad and sad and asked why he did it. She also said he made her body feel weird and said it was gross.

¶ 23    Stephanie McKnight Clark, the mother of J.T., testified that she lived in Venice, Illinois, in February 2019, with her three children. J.T. was the oldest of her children and was five years old at that time. She stated that defendant was her mother's ex-husband and they had lived in Granite City. Before everything happened, Stephanie's children would be at her mother's house almost daily. Defendant would also be there. Stephanie stated that on February 11, 2019, she was cleaning the bathroom when J.T. needed to talk to her and said it was an emergency. Stephanie said that J.T. seemed nervous, so she stopped cleaning the bathroom to speak with her. J.T. told her that defendant had touched her "booty" which was her vagina and her behind. She asked J.T. to show her what happened, and J.T. told Stephanie to lay on her back, so she did. Then J.T. squeezed Stephanie's vagina with her hand. Stephanie asked J.T. if that was all that happened, and

9

J.T. said no. She told Stephanie to lie on her stomach. Stephanie complied and then J.T. touched her behind. Stephanie testified that J.T. had last seen defendant the night before. Stephanie called the police and later took J.T. to Cardinal Glennon Children's Hospital for an examination and MCCAC for an interview. She said the kids stopped going to their grandma's house for about a month. Venita did not kick defendant out of the house. She eventually took the children back to their grandma's house because they missed her, and Venita missed them as well.

¶ 24 Stephanie learned about the 2020 allegations when the Granite City police were knocking on her door. When she found out what happened, Stephanie went to the police station and J.T. was there. She took J.T. to Cardinal Glennon Children's Hospital and later to a second interview with MCCAC.

¶ 25 On cross-examination, Stephanie stated that she was working at Amazon on August 7, 2020. She got off work early, went home, and went to bed. She turned the ringer down on her phone and did not hear the phone call from her mother. When the children were not going to Venita's house, Stephanie asked her aunt to watch the children, but her aunt could not do it. Neither could her sister, Brianna. She agreed that she was not in a financial situation to hire someone to watch her children during her night employment. She agreed that J.T. never told her that defendant peed and pooped in her mouth before August 2020. She further agreed that she was in court on a previous date when J.T. alleged that defendant put his penis in her butt. She stated that J.T. told her that sometime after August 2020. She reported the information to Sgt. Stacy. She stated that she talked to Sgt. Stacy between 5 and 10 times. She stated that she was not in the room when J.T. was speaking to the doctors in 2019 and she was not in the MCCAC interview room either.

¶ 26 J.T. testified that she lived with her mom, sister, brother, and two dogs, but the younger dog was gone now. She provided the names and ages of her siblings as well as the name and breed

10

of the dog. She provided the names of her grandparents and stated defendant had done things to her she did not like. One time, when she was at her grandma's house, she went in to use the bathroom. Defendant was in the hallway, and he put his front part in her mouth. She said it tasted nasty and happened one time. She called his front part a "peanut." That only happened once. Another time, she was sitting on the loveseat at her granny's house playing a game on her phone and defendant touched her front part. She clarified that her "front part" was where she peed. She stated that in August 2020, she was sleeping on the couch and defendant was on top of her riding her like a horse. She refused to demonstrate what defendant did to her. She said his front part was touching her front part.

¶ 27    On cross-examination, she agreed that she had been taken to the courtroom the previous week. She agreed that at that time she said that defendant put his private part in her butt. She agreed that she had not told her mom that before. She did not remember going to the MCCAC interview. She did not remember telling someone that defendant peed or pooped in her mouth. She said that neither of those things happened. She also did not remember going to the hospital.

¶ 28    On redirect, J.T. stated that defendant did not ask her to kiss his penis. She clarified that he asked her to put it in her mouth.

¶ 29    Jennifer Kampwerth was the forensic interviewer supervisor at MCCAC. She previously performed approximately 200 interviews. She stated that MCCAC was an independent Madison County agency and explained that they primarily interviewed children regarding allegations of sexual abuse, severe physical abuse, or if the child was a witness to a violent crime. Ms. Kampwerth interviewed J.T. on March 6, 2019. She stated that the allegations at that time were that J.T.'s grandfather had touched her vagina and butt over her clothing while she was spending the night at her grandmother's house. She said J.T. was five years old at the time. Typically, a

11

developmentally normal five-year-old child was able to answer questions and could tell what happened, who it happened with, where it happened, and if something happened more than one time. She stated such child could also provide a little sequencing, *i.e.*, what happened first, and circumstances surrounding the incident. She stated that J.T. answered the questions like a typical five-year-old. The 37-minute interview was played for the jury.

¶ 30 During the interview, J.T. stated that defendant does "bad stuff" so she is not allowed to go her grandmother's house anymore. When asked about the "bad stuff," J.T. said he "always touch[ed] me back here and back up here," pointing to her buttocks and genital area. When she slept on the couch, defendant always touched her "back there and down here" with his hand. She had her clothes on when defendant touched her. She said defendant did it "all the time when I come over there" and once told her he was sorry. When asked what she called the body parts she was pointing to, J.T. said they were her "burger." J.T. also said that she told her mother and grandmother.

¶ 31 Following presentation of the interview to the jury, Ms. Kampwerth confirmed that J.T. did not have any difficulty answering the questions. Ms. Kampwerth identified the photographs taken on the day of the interview as well as the anatomical diagrams used during the interview, and they were published to the jury. She stated that J.T. used the word "burger" for both her sex organ and her butt. Ultimately, J.T. stated that defendant touched both her sex organ and her butt. On redirect, she confirmed that parents might suggest to a child that something happened.

¶ 32 Jaclyn Hunziker testified that she was a forensic interviewer for MCCAC and previously performed over 400 interviews. She performed J.T.'s forensic interview on August 7, 2020. J.T. was six years old at the time. She stated that a six-year-old child had the same cognitive abilities as a five-year-old child. Ms. Hunziker stated that a six-year-old child would not know the

12

difference between urination and ejaculation because they had neither the knowledge nor the vocabulary that an adult would when it came to bodily functions or private parts. She was asked what information she had going into the interview and said,

"So[,] the information that I had going into this interview is what was reported, the allegations that [J.T.] and her siblings were being watched by their grandmother and their step grandfather and that [J.T.'s] grandmother caught the step grandfather, John Webb, doing pelvic thrusts on [J.T.] I also had information that John Webb has a criminal history, that he uses alcohol and crack cocaine. I also had knowledge that [J.T.] had been interviewed at the center before."

¶ 33    She confirmed that J.T. had siblings and stated that the youngest sibling, who was present during the alleged incident, was only two years old at that time and therefore was not interviewed. She stated that typically, children under three years of age were not interviewed. She stated that she observed J.T.'s prior interview. She did not speak to J.T. following the first interview. She confirmed that the August 7, 2020, interview was recorded. The recorded interview was published for the jury.

¶ 34    During the interview, J.T. stated that while her siblings were asleep on the couch at her grandmother's house, defendant tried to get on her, but she was trying to push him off her. Defendant got on her back. J.T. then specified defendant was on her behind and was riding her "like a horse." J.T. demonstrated that defendant did a kind of humping motion while he was on her. During the interview, J.T. indicated that defendant's penis was out while he was riding her, and it touched her buttocks. She stated that she tried to tell defendant to stop but he would not listen and told her not to tell her grandmother. She further stated that he tried to kiss her on the mouth. She also described her grandmother getting up and using curse words toward defendant.

13

J.T. denied that this had ever happened before but stated that he had showed her his penis before and "made me kiss it." She stated that he peed in her mouth after she kissed it. She stated it was yellow and tasted nasty. She said that only happened once in the hallway while her siblings were outside, and she did not tell anyone when it happened. She later stated that defendant also made her kiss his behind and pooped in her mouth while she was on a mattress in her grandmother's house. She later denied that defendant touched her with his front part at any other time.

¶ 35    After the recording was played, Ms. Hunziker stated that J.T. understood the questions, corrected any misunderstandings by Ms. Hunziker, and used language appropriate for her age. She did not speak to J.T. or her family following the interview.

¶ 36    On cross-examination, Ms. Hunziker stated that she had once interviewed a three-year-old child. She did not try to interview J.T.'s sibling because the child was only two years old. Following Ms. Hunziker's testimony, the State rested.

¶ 37    Defense counsel moved for a directed verdict, which was denied. Defendant stated he did not wish to testify, and the defense rested. The jury found defendant guilty of all three charges. On August 27, 2021, defense counsel filed a motion for judgment notwithstanding the verdict or, alternatively, a new trial, raising several allegations of error. The trial court denied the motion.

¶ 38    After the parties provided arguments at the sentencing hearing, the trial court sentenced defendant to 30 years' imprisonment on count I, and 5 years' imprisonment on counts II and II, which would run concurrent with each other and consecutive to count I. The written sentencing order stated that defendant was sentenced to 30 years' imprisonment for count I and 5 years on both counts II and III, with the sentence for count II to run concurrently with the sentence for count I and consecutive to the sentence for count III. Defendant timely appealed.

¶ 39                                    II. ANALYSIS

¶ 40    On appeal, defendant argues that he was denied his constitutional right to effective assistance of counsel where his trial counsel failed to object to Jaclyn Hunziker's hearsay testimony related to his criminal history and crack cocaine use because allowing a witness to tarnish a defendant as a criminal and consumer of crack cocaine had an obvious downside with no conceivable upside. He argues there is virtually no question that had counsel objected to the improper testimony and asked that it be stricken, the court would have sustained the objection, as the parties agreed that defendant could not be impeached with his prior convictions and the court ordered redaction of any mention of defendant's cocaine use from his recorded interrogation. In response, the State argues that defense counsel's failure to address the statement was trial strategy and no prejudice can be shown.

¶ 41    The standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), governs claims of ineffective assistance of counsel. *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). "To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Cathey*, 2012 IL 111746, ¶ 23 (citing *Strickland*, 466 U.S. at 687). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* (quoting *Strickland*, 466 U.S. at 694). The failure to establish either prong precludes an ineffective assistance of counsel claim. *People v. Cherry*, 2016 IL 118728, ¶ 31.

¶ 42    In determining whether counsel's performance was objectively unreasonable, "[j]udicial scrutiny of an attorney's performance must be highly deferential, and a reviewing court will not

inquire into areas involving the exercise of discretion, judgment or trial strategy." *People v. Valentine*, 299 Ill. App. 3d 1, 3 (1998) (citing *People v. Flewellen*, 273 Ill. App. 3d 1044, 1048 (1995)). As such, there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *People v. Brown*, 2023 IL 126852, ¶ 26. Defendant therefore must overcome the strong presumption that counsel's actions were a matter of sound trial strategy. *Strickland*, 466 U.S. at 689. Trial strategy includes whether or not to object. See *People v. Perry*, 224 Ill. 2d 312, 344 (2007) (the decision whether to object is a strategic one that may not form the basis of a claim of ineffective assistance of counsel). Accordingly, counsel's failure to object to testimony does not necessarily establish objectively unreasonable performance. *People v. Graham*, 206 Ill. 2d 465, 478-79 (2003).

¶ 43    Here, Ms. Hunziker made one statement that defendant had "criminal history" and used crack cocaine. Although she did not specify the nature of the previous criminal conduct, her statement at least indicated that defendant had prior criminal convictions. As defendant notes, Ms. Hunziker's statements as to defendant's prior criminal history and use of crack cocaine is inconsistent with the parties' agreement that defendant's criminal history was too old to be used for impeachment and to redact other references of defendant's illegal drug use. However, given the brief and isolated nature of the testimony, we find it highly probable that counsel made a strategic decision "to allow[ ] the statement to pass without objecting to diffuse its importance, rather than object and draw further attention to the statement." *People v. Evans*, 209 Ill. 2d 194, 221 (2004); see also *People v. Edgin*, 2022 IL App (5th) 190188-U, ¶ 42 ("we agree with the State that defense counsel may have decided that an objection to [the witness's] brief and nonspecific references to the defendant's 'priors' would have drawn attention to the testimony"); *People v. White*, 2011 IL App (1st) 092852, ¶ 75. Accordingly, we cannot find that counsel's failure to object

16

was objectively unreasonable under prevailing professional norms. *Evans*, 209 Ill. 2d at 221; *Edgin*, 2022 IL App (5th) 190188-U, ¶ 42.

¶ 44 Moreover, even if we found defendant's claim of a substandard performance by his counsel had merit, we find that defendant failed to show prejudice related to the incident. A single error by counsel does not violate the sixth amendment unless it is sufficiently egregious and prejudicial. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To prove prejudice, defendant must show but for counsel's error, there is a reasonable probability that the result of the proceeding would have been different. *People v. Jackson*, 205 Ill. 2d 247, 259 (2001). "[A] reasonable probability that the result would have been different is a probability sufficient to undermine confidence in the outcome—or put another way, that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Evans*, 209 Ill. 2d at 220. The error claimed here resulted in a brief, one-time mention of defendant's criminal history and drug use over the course of a three-day trial. The statement did not elaborate on defendant's criminal history or provide specifics as to that history. Given the record on appeal, we fail to see how the brief mention of the existence of a criminal history and drug use undermines confidence in the jury's judgment or rendered the trial fundamentally unfair. Accordingly, we find that defendant also failed to meet his burden to show prejudice under *Strickland*.

¶ 45 Because defendant failed to establish either prong of *Strickland*, his ineffectiveness claim fails, and we affirm the trial court's judgment. However, during our review, we discovered a discrepancy in the trial court's oral sentencing pronouncement and sentencing order. When orally pronouncing the sentence, the court ordered the sentences for counts II and III to run concurrently with each other but consecutively to the sentence imposed for count I. The written sentencing order states that the sentence for count I runs concurrently with the sentence for count II, and the sentence

17

for count II runs consecutively to the sentence for count III. "When the oral pronouncement of the court and the written order conflict, the oral pronouncement of the court controls." *People v. Roberson*, 401 Ill. App. 3d 758, 774 (2010). As such, we remand solely so the trial court can amend its written sentencing judgment to conform to the court's oral pronouncement.

¶ 46                                III. CONCLUSION

¶ 47    For the foregoing reasons, we find defendant's claim of ineffective assistance fails to show either substandard performance or prejudice. However, the court's oral sentencing pronouncement conflicts with its written sentencing order. We therefore affirm the trial court's judgment and remand for the court to amend its written sentencing order to conform with its oral pronouncement.

¶ 48    Affirmed and remanded with directions.