THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ALEXANDER FLEWELLEN, Defendant-Appellant.

First District (6th Division) No. 1—93—1584

Opinion filed June 30, 1995.

Rita A. Fry, Public Defender, of Chicago (Elyse Krug Miller, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Nancy Coletti, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE McNAMARA delivered the opinion of the court:

After a jury trial, defendant was found guilty of home invasion, attempted aggravated criminal sexual assault, armed robbery, and attempted first-degree murder. The trial court sentenced him to concurrent terms of 20 years for attempted murder, armed robbery, and home invasion, and 10 years for attempted aggravated criminal sexual assault.

On appeal, defendant contends that his counsel was ineffective; that he was not proved guilty of home invasion or attempted murder

beyond a reasonable doubt; that he was improperly impeached with a prior conviction; that the prosecutor improperly cross-examined him; that the trial court improperly ordered that his genitalia be photographed and allowed the jury to be informed of his refusal to be so photographed; that the prosecutor's closing argument was improper; and that the trial court erred in refusing to appoint new counsel for the post-trial hearing.

The pertinent facts are as follows. Prior to trial, the trial court conducted a hearing on defendant's motion to suppress his lineup identification. The court ruled that the lineup was not impermissibly suggestive and denied defendant's motion. Defendant does not challenge that ruling, and it is not necessary to recite the testimony adduced at that hearing.

At trial, the victim testified that on September 3, 1991, she was alone in her home in Chicago. At 8:30 p.m., she heard a knock on the door. She looked out and saw a man on the porch, whom she later identified as defendant. The victim recognized the defendant from the community. She did not know him by name. Ten years previously, defendant had fixed her stereo and had recently come to inquire how the stereo was working.

When the victim answered defendant's knock, he was holding a puppy. He asked the victim if she wanted to buy the puppy. She replied that her husband would have to make that decision and that he would not be home for a couple of hours. Defendant then asked for a match, and after the victim handed him a match through the burglar gate, defendant asked to use her bathroom.

The victim remained in the living room while defendant used the bathroom. When he came out, he asked for a glass of water and followed the victim into the kitchen. After getting the water, defendant grabbed the victim so hard that he knocked her to the floor. As she struggled to get up, defendant grabbed a knife from the kitchen counter.

Defendant dragged the victim to the living room while holding the knife to her throat. He then pushed her down on the sofa. With the knife still in his hand, defendant pulled his pants down and ordered the victim to suck his penis. When the victim drew back, defendant struck her with the back of the knife.

Defendant ordered the victim to get up and dragged her to the television set. As defendant bent over to unplug the VCR, the victim tried to escape by crawling toward the bathroom. Defendant grabbed her and smashed her head and nose to the floor. Defendant got on top of the victim and choked her. She lost consciousness. When she regained consciousness, she slid along the wall and tried to remove

the wallet from her purse. Defendant grabbed the wallet, removed some money, and fled.

When defendant fled, the victim ran across the street to her mother's home. The police were called, and she was taken to a hospital where she was treated for her injuries, including a fractured nose.

Six days later, the victim saw a group of men standing in front of a nearby store. Wondering if her assailant was in the group, she walked over to the store. Her assailant was not there but she told the men what had happened to her. One of the men gave her some information which she relayed to the police.

Later that day, the victim went to the police station where she viewed a lineup. She identified defendant, who was in the lineup, as her assailant. After she identified defendant, Officer Thomas Ptak asked her if defendant had any unusual marks or tattoos. The victim told the officer that she remembered defendant's testicles and that they were unusually small. Ptak ordered defendant to remove his pants, and the victim identified defendant's testicles.

Officer Ptak testified and corroborated the victim's testimony regarding the lineup. He also stated that the victim expressed no hesitancy or uncertainty in her identification of defendant.

Officer Massey testified for the State that he responded to the victim's call on September 3. The victim was very upset, and she had blood on her face. Massey followed the victim to the hospital where she described her assailant as being 5 feet 8 inches tall and weighing 150 pounds. She remembered defendant's face as he had once repaired her stereo.

Officer Gregory Mitros testified that he visited the victim on September 9 to take the information that she had. The victim told him an anonymous informer, who refused to identify himself, gave her the first name of her assailant, Alex, and a street address. Mitros, whose testimony will be set down in detail later in this decision, went to 5918 South Hermitage and spoke to a woman. She said that she had a son named Alexander. He was not home. Mitros wrote up his report and asked another police officer to follow up.

Officer Philip Burton testified that he went to defendant's home and arrested him. In his report, Burton set down defendant's height and weight as 6 feet 2 inches and 180 pounds.

Linda Flewellen, defendant's sister, testified on his behalf that on September 3, 1991, she and defendant visited a friend. They arrived at 6 p.m. and stayed until 8 or 8:30 p.m. As they walked home, defendant saw his friend, Prince Oliver, and went with him to a store. About 15 minutes later, she saw defendant and Prince sitting on the

front porch. She joined them, and they sat drinking wine for a couple of hours.

Linda stated that her mother's dog had recently given birth to 11 puppies. Her brother Brian was selling the puppies, but she did not know if defendant was.

Defendant testified that on September 3, 1991, he arrived at his mother's home from work at 8:10 p.m. He and Linda then went to a liquor store to buy wine. Defendant and Linda then visited a friend's house, and he stayed there until after 9:30 p.m.

Defendant did not see Prince Oliver that evening, but saw him earlier in the day. Defendant gave puppies away on August 31, but he did not sell or give away puppies on September 3. He denied seeing the victim that evening. Defendant also denied ever trying to sell puppies to the victim, ever fixing her stereo, or entering her home and attacking her.

Officer Ptak and an assistant State's Attorney testified in rebuttal that after initially telling them that he knew the victim from the neighborhood, defendant then denied knowing her at all.

Defendant initially contends that his attorney was ineffective. He bases this contention on counsel's failure to file a motion to quash defendant's arrest and suppress evidence. He also argues that ineffective assistance is demonstrated by counsel's failure to object to improper hearsay testimony and to certain comments made by the prosecutor during closing argument.

To establish ineffectiveness of counsel, a defendant must show that his attorney's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's professional errors, the results of the trial would have been different. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052; *People v. Albanese* (1984), 104 Ill. 2d 504, 473 N.E.2d 1246.) Judicial scrutiny of an attorney's performance must be highly deferential, and a reviewing court will not inquire into areas involving the exercise of discretion, judgment, trial tactics or strategy. *People v. Pecoraro* (1991), 144 Ill. 2d 1, 578 N.E.2d 942; *People v. Janis* (1992), 240 Ill. App. 3d 805, 608 N.E.2d 359.

■ We consider first defendant's claim that counsel was ineffective in failing to object to Officer Mitros' testimony as to the substance of his conversation with the victim. As a further part of this argument, defendant asserts that his attorney failed to object to certain improper comments of the prosecutor.

At trial, Mitros testified that he spoke to the victim on September 9. He testified as follows:

> "Q. [PROSECUTOR]: And in the early afternoon hours at approximately 1:00 p.m., did you receive any particular assignment?

A. [Mitros]: Yes, I did.

Q. And what was that?

A. Call of information for the police.

Q. And what did you do after receiving that information?

A. Went to the address that was given me. When I arrived at the address, I knocked on the door and I spoke to a lady who is now known as [the victim].

Q. After receiving your assignment, did you go to 1940 West 59th Street?

A. Yes, I did.

Q. What's at that location?

A. The residence of [the victim].

Q. And you spoke with her?

A. Yes, I did.

Q. And what did she tell you, at that time?

A. She related that she had been the victim of a crime earlier. And that she had received some information from somebody on the street who did not wish to identify himself. And the information she gave me was she learned the first name of her attacker, and an approximate residence of where he was. It was, I believe, the second house south of an alley on the west side of Hermitage in the 5900 block.

Q. Did she give you the first name of the attacker?

A. Yes, she did. It was Alex.

Q. After speaking to [the victim] and receiving the information, what did you do?

A. Well, I called for a backup unit because of the nature of the offense. And when the unit arrived, both of us went over to that location, found out the address was 5918 South Hermitage. Made an attempt to locate somebody. Lady came to the door. I asked some questions, if there was an Alex there. She said, 'He's not here now. I'm his mother.' And which time, I got some information from her. The offenders [sic] last name. And I completed a report. Stated that he was named in a police case report and he should contact the tactical team to try to clear the matter up. And I submitted my report.

Q. So, the—the woman that you spoke to identified herself as the defendant's mother?

A. Only as the mother, yes. Didn't give any name.

Q. And what name did she give you?

A. Alex Flewellen.

Q. You then returned to the station after receiving the information?

A. I originally went back, I believe, to the victim's house and told her I couldn't locate him. Then I went to the station, submitted my report.

Q. What did you do with the information you received from the victim?

A. Made a copy of my report, gave it to one of the tactical officers, told [sic] him if he'd be interested in the follow up on it."

After this testimony was concluded, the trial judge expressed amazement that defense counsel failed to object to the foregoing testimony. The judge added that he would have sustained such an objection if it had been made. During closing argument, without objection, the prosecutor offered the following various observations:

"[The victim] is a brave and courageous woman. And she's a smart lady. She wasn't content to merely let the police handle this investigation. And that was smart thing. Given all the violent crimes, the increase of the murders we have today in this city, the police only have so much time and resources to deal with each individual crime. [The victim] knew she could help the police. She realized that she'd seen the defendant before. He'd been in her home before. And she knew there's a good chance he lived in the neighborhood. She knew that she could find this man.

She made inquiries in the neighborhood and spoke to some people in the neighborhood. And on September 9th, 1991, she learned the name of this man, Alexander. And she received information where he lived. She passed that information on to the police. And later that day, the police arrested the defendant using the information that [the victim] had provided them with.

\* \* \*

Eventually, [the victim] goes out on the street. And the first time she approaches some people in the neighborhood she's given some information. Results in his arrest. And you heard how that arrest took place.

\* \* \*

Now, you know, you ask yourself why does [the victim] have to go out and try and help in this investigation. This would be a wonderful city, folks, if we only had maybe two crimes occurring every month in the City of Chicago. But unfortunately, and no one is asked to put blinders on, one or two crimes occur every second in this city.

That yes, the case was assigned to violent crimes detectives, but why should [the victim] sit back on her haunches. Why should citizens sit back on the haunches. You know here today that because of citizen involvement, we have him sitting over there. Because she went out and asked those individuals. And you remember Officer Mitros' testimony. He was given the name Alex. He was given a specific location. They didn't know the address. He

was directed to a specific house on Hermitage. And the police went there directly because of citizen involvement. I guess the defense would just belittle [the victim] for trying to help. I would suggest to you it was a courageous and important act. Bespeaks hopefully of what Chicago is about. That people don't turn their back on another human being when help is being sought."

A police officer may testify that he had a conversation with a complainant, but he may not testify as to the substance of the conversation, as it is impermissible hearsay. (*People v. Gacho* (1988), 122 Ill. 2d 221, 522 N.E.2d 1146.) In the present case, without objection, Officer Mitros improperly testified as to the substance of the conversation he had with the victim. This was impermissible hearsay. In that testimony, Mitros also testified about the conversation the victim had with the anonymous informant. This was double hearsay. Moreover, the prosecutor exacerbated the error of this improper testimony by comments made during closing argument. During those remarks, the prosecutor persistently invited the jury to consider the improper evidence to find defendant guilty of the charges against him.

Under these facts and circumstances, we find that defense counsel's failure to offer any objection to the testimony or comments demonstrated ineffective assistance. The evidence in question was highly prejudicial to defendant. The jury could well have used it to find defendant guilty of the charges against him. The State's case was not so overwhelming that defense counsel's failure to prevent the evidence in question could not have affected the verdict of the jury. The victim was a strong witness in testifying that defendant was her assailant, but defendant testified and denied the charges. Counsel's failure to have this evidence and comments excluded could not have been a matter of strategy or trial tactics. As we have noted, the trial judge expressed amazement that the hearsay testimony had not been objected to. Notwithstanding that statement, counsel did not even raise the issue in his motion for a new trial. Defendant was denied effective assistance of counsel and is entitled to a new trial.

In view of that holding, it is unnecessary to consider defendant's claim that counsel's failure to file a motion to quash the arrest demonstrated ineffective assistance. We shall, however, comment on several issues that might recur in the new trial.

The State presented sufficient evidence to prove defendant guilty of the four charges against him beyond a reasonable doubt.

■ We hold that the State committed reversible error by commenting on defendant's post-arrest silence. In *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, the United States

Supreme Court held that the use for impeachment purposes of an accused's silence when arrested and after receiving *Miranda* warnings violated the due process clause of the fourteenth amendment.

In the present case, defendant refused to speak to the police about his whereabouts on the day of the crime, September 3, 1991. Nevertheless, in violation of *Doyle*, the prosecutor cross-examined defendant extensively, presented two rebuttal witnesses, and commented on defendant's post-arrest silence during closing argument. The State properly impeached defendant with contradictory statements he gave about his whereabouts on the day before the crime. However, defendant exercised his right to remain silent regarding his whereabouts on the day of the crime, and impeachment as to that day was improper.

■ We comment briefly on defendant's argument that the jury was not properly instructed as to the elements of home invasion. The trial court gave the Illinois Pattern Jury Instruction as to the elements of home invasion. That instruction contained no direction regarding defendant's intent at the time of entry into the home. Some months after the present trial, our supreme court ruled that in a home invasion charge, when appropriate, the jury must be instructed as to defendant's intent at the time of entry into the home. (*People v. Bush* (1993), 157 Ill. 2d 248, 623 N.E.2d 1361.) Consequently, such an instruction should be given at the new trial.

■ In the present case, the trial court properly allowed the State to impeach defendant with a prior conviction.

■ The trial court also properly exercised its discretion in ordering that defendant's genitalia be photographed and in allowing the jury to be informed of defendant's refusal to be photographed.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed, and the cause is remanded for a new trial.

Judgment reversed and remanded.

EGAN and ZWICK, JJ., concur.