NOTICE

Decision filed 06/13/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 200194-U

NO. 5-20-0194

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Marion County. |
| | ) | |
| v. | ) | No. 19-CF-04 |
| | ) | |
| BART N. BROWN, | ) | Honorable |
| | ) | J. Marc Kelly, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Barberis and Boie concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Defendant failed to prove counsel provided unreasonable representation by failing to request severance of his unlawful possession of firearm and ammunition charges.

¶ 2    Defendant, Bart N. Brown, appeals from his conviction, arguing that his trial counsel was ineffective. For the following reasons, we affirm.

¶ 3                                I. BACKGROUND

¶ 4    In connection with the January 1, 2019, shooting of Justin McMath at defendant's home, defendant was convicted of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2018)) (count I), unlawful possession of weapon by a felon (*id.* § 24-1.1(a)) (count III), and unlawful possession of ammunition by a felon (*id.*) (count IV). Counts III and IV were Class 2

1

felonies based on defendant's previous conviction for the forcible felony of burglary in Washington County case No. 03-CF-114.

¶ 5       Prior to trial, on June 6, 2019, the State filed a motion *in limine*. Therein, the State requested it be allowed to admit defendant's prior convictions for aggravated DUI (case No. 13-CF-226), domestic battery (case No. 14-CM-38), and aggravated battery (case No. 18-CF-26), for impeachment purposes.

¶ 6       The court did not hear arguments on the State's motion *in limine* until the beginning of the second day of trial while the State was presenting its case in chief. At that time, the State orally amended its motion, stating it intended to impeach only with 13-CF-226 and 18-CF-26. The defense agreed those convictions would be in the permissible time period to be used for impeachment purposes "with a certified conviction or if we could stipulate to that." Defense counsel argued the fact that defendant's charges were enhanced with a prior conviction more than 10 years old would cause confusion. The State clarified that the prior burglary conviction was an element of the offense that it was required to prove and would not be used for impeachment purposes. It noted if defense counsel chose to stipulate to the prior burglary conviction, it would not be required to submit a certified copy of the conviction. Defense counsel stated, "we would prefer to stipulate" and requested the stipulation include the year of the conviction.

¶ 7       The court then explained to defendant that the prior burglary conviction was an element of counts III and IV, what was being stipulated, and the consequences of such stipulation. Defendant stated he understood. Defendant also confirmed that he agreed with the stipulation.

¶ 8       In arguing against the State's motion *in limine*, defense counsel stated there was no reason to admit both prior convictions for impeachment and to do so would be prejudicial, especially

where there would also be evidence of an old burglary conviction to prove an element of counts III and IV. The court granted the State's motion regarding case Nos. 13-CF-226 and 18-CF-26.

¶ 9 The evidence at the four-day trial showed that about a week prior to this incident, defendant, McMath, and other friends went drinking at a bar. While at the bar, defendant and one of McMath's friends, Eddie Cain, got into a fistfight. Defendant received a black eye from the altercation.

¶ 10 On January 1, 2019, McMath and defendant were drinking at a friend's house. That afternoon, while it was still light outside, the men went to defendant's house, at 704 E. Rasback. Around 5:50 p.m., defendant made McMath leave his house. Immediately thereafter, McMath punched and kicked the front door of defendant's house. McMath then went around to the back of defendant's house and entered through the back door. Defendant shot McMath with a sawed-off shotgun, and shortly after, around 5:54 p.m., McMath called 911. McMath was admittedly intoxicated at this time. Neither man saw the other with a shotgun that day prior to the shooting.

¶ 11 During a search of the house, officers found 32 shotgun shells (including both deer slugs and bird shot) and 7 handgun rounds in an orange shoebox located between the door and closet of the northeast bedroom. Officers also discovered 11 shotgun shells in a Crown Royal bag under the couch, as well as a shotgun shell under a pair of jeans in a wardrobe, located in the southeast bedroom. No firearm was found in or outside of the residence. Defendant was also not located that night but turned himself in the following day.

¶ 12 Eleven clips of video surveillance (State's exhibit Nos. 2-A through 2-K) from the house of defendant's neighbor, Phillip Isaiah, were admitted into evidence and published to the jury. The videos showed that a little after 5:50 p.m., McMath walked out of the front door of defendant's house. He then punched and kicked the door and walked around the left corner of the house, turned

the corner, and was no longer seen on screen. About 45 second later, defendant exited the front door holding a shotgun. He paced the front porch, then turned the left corner of the house. The primary issue at trial was whether the victim—McMath—had the gun first and defendant wrestled it away or if defendant had the shotgun the entire time.

¶ 13    During the second day of trial, Justin McMath testified that he met defendant through common friends about four years ago and they became close friends. McMath stated he visited defendant's house a handful of times but did not know his exact address.

¶ 14    McMath testified that on New Year's Day, after drinking at a friend's and defendant's sister's houses, he and defendant went to defendant's house to listen to music and continue to drink. By this time, they were nearing the end of a fifth of brandy, so defendant had his mother pick him up another pint of brandy to drink at his house. McMath testified that at some point, they got into an argument, which included a discussion about the bar fight. McMath told defendant that it was a whole new year so he could leave the fight in 2018. This made defendant mad because he took McMath's statements as defending Cain. Defendant then stated if McMath did not like it, he could get out of his house. McMath testified that he probably got angry, but it was never to the point that he was going to attack defendant. He further testified that even though he was drunk he was still conscious of everything occurring. McMath left through the front door. McMath disputed pushing defendant up against the dresser and defendant pushing him against the bedroom door.

¶ 15    Once outside, McMath realized he left his cell phone in defendant's house and aggressively banged on the front door so that he could retrieve his cell phone. McMath testified that defendant did not answer the door. McMath then called out asking defendant to answer the door and let him get his phone. When defendant did not answer the door, McMath got mad and started punching the door. Defendant still did not answer the door and McMath started kicking the door. McMath

4

testified he was not trying to kick the door in. At that point, he walked away from the door but still wanted to retrieve his phone, so he went around the house to the back door.

¶ 16    McMath testified that he did not have anything stashed on the side of the house. When he was at the back door, McMath banged on the door until he remembered that defendant's back door could not be locked. He testified he just turned the knob and pushed the door, and it came open. When he walked into the back room, almost past the kitchen area, he saw his phone lying on the floor. To his knowledge, he did not leave his phone there, and he believed his phone was in defendant's room. McMath picked the phone up off the floor and, as he did so, he saw a glimpse of defendant. When asked what McMath meant by seeing a glimpse, McMath stated he saw "kind of like a shadow, big guy, like that's [defendant], so I didn't think nothing of it, grabbed my phone, headed out the back." McMath then testified he was intoxicated, a lot was going on, and he saw a shadow of a bigger guy. As he went to leave the house, he heard a shotgun fire. McMath knew it was a shotgun because he knew how a shotgun sounds. McMath testified he did not realize he was hit right away until he felt the pain and looked down to see his arm dangling free. He then remembered screaming at defendant, cussing, stating he could not believe defendant shot him, and calling defendant expletives. McMath testified he made it out the back door and then called 911.

¶ 17    McMath testified he was taken to the hospital, and on January 3, 2019, Lieutenant Dodson came to the hospital to talk with him. McMath agreed that his memory on some smaller issues would have been better on January 3, 2019, than it was at trial. He agreed he told Lieutenant Dodson that after he called 911, he did not really know what happened. McMath stated he was intoxicated and after a while all he could think about was the pain and trying to get some help. McMath stated he told Lieutenant Dodson on January 3, 2019, that when he entered the house, defendant was standing by the kitchen door and was holding a shotgun. When asked if that was

5

what he saw or not, McMath stated that he remembered seeing a shadow. McMath further stated he did not know if he added anything else in his statement, but he knew the hospital gave him pain medications, including morphine, oxycodone, and Percocet, and he was under the influence of those drugs when he spoke with Lieutenant Dodson. He believed even the doctor told Lieutenant Dodson that he was in no condition to talk. The State then asked what he saw regarding the shadow that would have led him to tell Lieutenant Dodson that he saw defendant with a shotgun. McMath stated all the rooms in the house were in close proximity, and the kitchen was close to the room where he saw the shadow and picked up his phone. He further stated he was intoxicated and was not sure if he saw the shadow.

¶ 18    McMath agreed he told Lieutenant Dodson the gun was a double-barreled sawed-off shotgun. When asked why McMath told Lieutenant Dodson that, McMath stated he assumed it was the same sawed-off shotgun he had seen in defendant's bedroom during his prior visits to the residence. McMath agreed he did not see the shotgun earlier that day. He remembered telling Lieutenant Dodson about his phone being left in defendant's house. He did not know whether such information was in his written statement that he signed.

¶ 19    McMath stated that Lieutenant Dodson wrote out his signed written statement. The State asked if he read the statement carefully before signing it, as required. McMath replied, "not really *** I don't think he fully put in the report when he was talking to me, because a lot I do remember, *** it's rarely [*sic*] I forget things that I tell people and I know I told him about the phone." McMath testified he was diagnosed with schizophrenia when he was 15 and was prescribed Remeron and Zyprexa. He said his medication helped control his schizophrenia. When asked if he took his medication on New Year's Day, McMath stated "yes and no, because I don't take it until

6

the night time, like 9:00, 10:00 maybe, before bed." He agreed he was not supposed to drink when he took his medicine, but stated he drank before it was time to take his medicine for that day.

¶ 20    McMath agreed he had a prior criminal record in Missouri for possession with intent to deliver a controlled substance. He also agreed that he had two prior 2009 residential burglary convictions and two misdemeanor resisting a peace officer convictions from St. Clair County. He further agreed to having a 2017 felony aggravated assault conviction and a 2017 misdemeanor domestic battery conviction in Marion County.

¶ 21    McMath testified he felt betrayed by defendant. He agreed he made some Facebook Live videos when he was in the hospital. He stated in some of the Facebook Live videos, he talked about what happened on New Year's Day. McMath remembered calling defendant a coward and using a lot of cuss words but stated he never threatened defendant. McMath agreed that he probably said defendant was not only a coward for shooting him in the back but was also a coward because defendant did not want to fight McMath in a fistfight so he would not get another black eye. McMath agreed that he was mad when he made the videos. McMath stated he also got mad at defendant's sister, Erica Brown, but did not remember ever mentioning Erica in the videos. He believed Erica was saying things that were not true about what happened on New Year's Day. McMath agreed that he said if he saw Erica again, he would spit on her. McMath testified that he believed defendant's mother was in the house when he was shot but agreed he did not see her.

¶ 22    On cross-examination, McMath testified he reviewed his signed written statement before his testimony and that his written statement was not correct. He agreed that his testimony was more accurate and that he only saw a shadow after he picked up his phone. He stated that he was in the intensive care unit when Lieutenant Dodson came to talk with him, and he agreed he was "pretty woozy" at that time. He testified that he did not take any medications before his testimony.

7

McMath denied telling defendant's ex-wife a couple weeks after the incident that he was going to kill defendant and defendant's children. McMath confirmed that he reviewed all his Facebook Live videos. Counsel asked if he made threats of wanting to kill people on the videos. McMath testified he did not make any threats that he wanted to hurt or harm anybody in his Facebook videos. Counsel asked McMath whether he told defendant that he was not Cain and he would beat or kill defendant when defendant asked him to leave. McMath stated he did not. McMath did not remember going into defendant's mom's room or saying anything to upset her. McMath agreed he did not have a very good memory of the latter part of that day due to being intoxicated.

¶ 23    Defense counsel then played three of the Facebook videos that McMath made. McMath testified that on one video, he referred to tuning up defendant which meant they could have fought as men that night. McMath testified that he was on probation as of January 1, 2019, for his domestic battery conviction. McMath agreed that in another video, he stated that he would be around Centralia and said, "I'm going to Michael Meyers your a**." He agreed Michael Myers referred to the slasher who wore a white mask in the movies. Defense counsel then stated one video showed defendant saying he was going to slap defendant's mother and called defendant's mother and sister names and asked why McMath was mad at defendant's sister and mother. McMath stated he heard rumors that defendant's sister told lies about the incident. McMath then identified a post he made on Facebook dated January 17, 2019. He agreed the post indicated if he and defendant got into a fight, McMath would have severely beaten defendant. He further agreed he was trained to fight through boxing classes. He stated that he fought in jail and pretty much all his life.

¶ 24    Doctor Dale Long testified that he worked at the emergency room at St. Mary's Hospital in Centralia on January 1, 2019. Around 6:26 p.m., Justin McMath was brought into the emergency room. Doctor Long examined McMath and observed a wound in his upper back that went into his

8

scapular area and another wound on his clavicle. Based on the examination and x-rays, Dr. Long determined a deer slug hit McMath's scapula, shattering it, and those pieces came forward to hit the rib, and bounced a little up toward the collarbone. He stated the entry wound was probably the upper right back. Dr. Long testified that McMath was transported to Saint Louis University Hospital (SLU). He reviewed the three-dimensional reconstruction CT scan taken by SLU the following day. The scans were consistent with the projectile entering through the back, striking the scapula, pushing the bone fragments to the chest, and exiting through the chest.

¶ 25    During the third day of trial, Trooper Jason Craddock of the Illinois State Police testified that around 6:40 p.m. on January 1, 2019, the Centralia Police Department sent him a request to assist with a crime scene. He collected the evidence for this case. Trooper Craddock arrived at the hospital in Centralia about 7:45 p.m. and met with the ER doctor who treated McMath. Trooper Craddock then went to defendant's house. He entered the residence with Centralia police officers via the front door, which was at the south side of the house, and went into the living room. As he began to walk north, he entered the kitchen, and a utility room which was north of the kitchen. He observed blood on the kitchen and the utility room floor. Tropper Craddock testified that a projectile entered the interior side of the back door and protruded out the exterior side of that door. He stated the projectile was a deer slug from a shotgun. Red, blood-like stains were also found on the outside of the back door.

¶ 26    On cross-examination, Trooper Craddock testified he was not able to speak with McMath when he visited the hospital on January 1, 2019, because McMath was actively receiving medical treatment. He stated he never tested McMath's hands for gunshot residue. Based on his observations, he was not sure whether McMath was in the utility room or kitchen when he was shot but knew McMath was somewhere south of the most north back door. Trooper Craddock did

9

not know if anyone tested the gunshot shells to see if they in fact would fire. To his knowledge, no testing was completed on the projectiles found in the back door. Trooper Craddock stated that when he completed his crime scene investigation, he signed all evidence over to the Centralia Police Department and would not know what testing occurred after that point. Defense counsel asked if there was any evidence that the back door had been kicked, and Trooper Craddock stated he could not say for certain. On redirect examination, Trooper Craddock stated he did not see any tread patterns on the exterior of the back door.

¶ 27    The State next called defendant's mother, Willetta Brown, to testify. She stated that on January 1, 2019, she lived at 704 Rasback with defendant. At that time, her bedroom was on the northeast side of the house, defendant's bedroom was on the southeast side of the house, and a third bedroom in the middle of the house was a spare bedroom. On cross-examination, Willetta stated sometime prior to January 1, 2019, her bedroom was the southeast room, defendant's bedroom was the middle room, and the northeast bedroom was a spare room.

¶ 28    Lieutenant Greg Dodson of the Centralia Police Department testified that on January 1, 2019, he responded to reports of a shooting at 704 E Rasback. Lieutenant Dodson testified that he did not request a blood pattern analysis review of the blood spatter located on the interior of the back door because there was not enough splatter to analyze. He further stated they did not try to get fingerprints off the gunshot shells found in the house because they were plastic ribbed shells which did not have a surface conducive for lifting fingerprints. He did not order ballistics from the slug recovered from the back door because the nature of a deer slug did not lend itself to ballistic testing and they also did not have the weapon. He did not request testing for the blood swabs taken from the blood in the house because the blood trail from inside the house led directly to a bleeding victim.

10

¶ 29 Lieutenant Dodson testified that the Marion County Sheriff's Department contacted him at 6:40 p.m. on January 2, 2019, and informed him that defendant turned himself in. Lieutenant Dodson then went to the Marion County Sheriff's Department and interviewed defendant. The interview was video and audio recorded. He identified the State's exhibit No. 2-O as the interview of defendant. The court admitted the video into evidence and published it to the jury.

¶ 30 In the video-recorded interview, defendant stated his eye was injured from a fight with one of McMath's friends, Cain, roughly a week earlier. He, McMath, defendant's daughter, and defendant's mother were at his home on January 1, 2019. McMath became too drunk and started an argument. McMath also bothered defendant's mother. Defendant asked McMath to leave, which made McMath angrier. Defendant said that McMath pushed him against the dresser, so he pushed McMath against the door. Eventually, defendant pushed McMath outside and McMath told defendant to step outside. When defendant pushed McMath outside, McMath stated, "I'm not Cain *** . I'll kill you." Defendant shut the door and locked it. He then heard McMath kick the door and bang on the side of the house. He did not hear anything else for a moment then heard McMath walk towards the back door, so defendant ran to the back door. Defendant stated that although the back door was locked, it would open if it was bumped into enough. Before defendant could secure the back door, McMath got in and had a sawed-off shotgun in his hand. Defendant stated a struggle ensued and when he went to rip the gun out of McMath's hands, the gun went off. Defendant went into shock and left out of the front door. Defendant did not know where McMath got the gun and stated he had no guns in his house. When asked about the neighbor's video surveillance showing defendant coming out of the front door with the shotgun, defendant stated that it occurred after the gun accidentally fired.

11

¶ 31    The court then announced that the parties stipulated that defendant had been convicted of felony burglary in Washington County case No. 03-CF-114. The State rested.

¶ 32    Defense motioned for a directed verdict, arguing the State's evidence showed that McMath unlawfully entered defendant's home in a riotous manner and defendant acted in self-defense. The court denied the motion.

¶ 33    Defense counsel then announced it would seek a necessity defense with respect to count IV and would file a pleading asserting the same. Counsel also indicated that she did not know if defendant would testify. The court then had the defense call its witnesses.

¶ 34    For the defense, Willetta Brown, defendant's mother, testified that after she dropped defendant off at a friend's house, she went home and fell asleep until she was startled by McMath coming into her room in an aggressive manner. She stated she had a rule that her bedroom was private, and no one was to enter. She also had a rule that the front half of the house was defendant's, and the back half was hers. So, no one could go to the back door unless it was her friends or her grandchildren; defendant's friends had to enter through the front door. Willetta testified that McMath knew these rules. Willetta testified when McMath was standing in her room, she got up and he was talking about "his queen or something." Willetta headed to the kitchen and McMath followed, trying to get her attention. Defendant then came from his bedroom into the kitchen and told McMath to leave her alone. Shortly thereafter, she left her house. Willetta received a call around 6:08 p.m. that the police were at her house, so she returned home around 6:15 p.m.

¶ 35    Willetta testified she lived at that residence for four to five years and all the furniture in the home belonged to her. Willetta stated that she was married to David Brown, who passed away in 2011. David had weapons but sold all of them before he passed. When shown a picture of the orange shoebox that contained shotgun shells, Willetta stated the bullets were probably hers or

12

David's. She did not see defendant bring those into the home and she did not buy any shotgun shells in the recent years. She agreed if they were in her bedroom, both would have belonged to her husband. She testified that she would not have left the shoebox of shells where the police found it and believed it was stored in a cardboard box against the back wall.

¶ 36 Willetta testified that the couch located in defendant's bedroom had been in the room since she moved in. She agreed when she moved out of that room, some of her things stayed behind in the room. Willetta testified she was aware defendant could not own a weapon due to his prior conviction. She would not have allowed defendant to have a weapon. She testified she had numerous weapons, but they were kept by other members of her family who lived out west.

¶ 37 On cross-examination, Willetta clarified that her husband passed away prior to her moving into 704 E. Rasback. She stated she moved from the southeast bedroom to the northeast bedroom within a year of moving into the residence. Willetta stated when she dropped defendant off on January 1, 2019, she did not see him with any alcohol then or at any point that day. McMath woke her up and followed her to the kitchen around 5:30 or 5:45 p.m. She observed bloody shoe prints on the outside of her back door when she was allowed back into her house that night. The court recessed trial for the day.

¶ 38 The following day, defense counsel filed a notice of intent to offer defense of necessity. The notice stated that defendant intended to assert the defense regarding the counts of unlawful possession of a weapon by a felon and unlawful possession of ammunition by a felon.

¶ 39 Prior to resuming trial, defense counsel informed the court that defendant decided not to testify. After the court informed defendant of his right to testify and that it was his sole decision, defense counsel indicated defendant had second thoughts about testifying and counsel wanted a

13

moment to confer with his client. After a few moments, defense counsel stated defendant decided not to testify.

¶ 40　Counsel then proceeded with the redirect examination of Willetta. When asked if she would be surprised if defendant had stored shotgun shells in a Crown Royal bag, she replied "wherever he wanted to put them." Willetta stated she had never purchased bullets ever, but it was her belief that ammunition found in the house belonged to her husband. She never saw defendant in possession of the Crown Royal bag. Willetta stated that her husband's choice of alcohol was whiskey.

¶ 41　On recross-examination, the State asked if Willetta put the Crown Royal bag under the couch in the front bedroom. She replied that to the best of her knowledge, she did not but her husband may have. Willetta also stated that the bag could have fallen under the couch, then stated there was a possibility that she did because she put the couch in that room. Willetta later stated that she did not recall if she had put the bag under the couch. She testified that she did not put two loose shells on the floor in the front bedroom. She also did not recall putting a loose shotgun shell in the top drawer of the wardrobe in the front bedroom.

¶ 42　The jury found defendant guilty. Defense counsel filed a motion for a new trial on September 13, 2019. The motion contended that the court erred in denying defense's motion for a directed verdict because the evidence proved defendant had a right to use reasonable force to protect himself and his home. The motion also asserted several grounds, including three jury instruction errors, the victim was not credible, the verdict was against the manifest weight of the evidence, and several evidentiary errors. The same day, defense counsel filed a motion notwithstanding the verdict, arguing—*inter alia*—that the verdict was against the manifest weight

14

of the evidence and defendant should be acquitted where he had the right to use reasonable force to protect himself and his home.

¶ 43    On October 23, 2019, the court denied the motion for judgment notwithstanding the verdict. The court also determined the motion for a new trial should not be addressed until after sentencing. On November 5, 2019, the court entered judgment, sentencing defendant to imprisonment for 20 years for aggravated battery, 5 years for unlawful possession of a weapon by a felon, and 5 years for unlawful possession of ammunition by a felon, all to be served concurrently.

¶ 44    A motion to reconsider the sentence was filed November 27, 2019. Defendant also filed a notice of appeal on November 27, 2019. The appeal was dismissed as premature. *People v. Brown*, No. 5-19-0502 (2020) (unpublished order).

¶ 45    On July 1, 2020, the court denied defendant's motion for a new trial and motion to reconsider his sentence. Defense counsel filed an amended notice of appeal on July 6, 2020.

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, defendant contends that counsel provided ineffective assistance of counsel in failing to sever the possession charges from the aggravated battery charge. He argues the failure to sever the charges prejudiced him where the aggravated battery charge was a credibility contest and trying the charges together placed his prior burglary conviction before the jury.

¶ 48    The sixth amendment of the United States Constitution and the Illinois Constitution provide a constitutional right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. A claim that counsel provide ineffective assistance is evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 688 (1984). *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984) (Illinois Supreme Court adopting the *Strickland* standard). To

15

prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 86. The failure to establish either prong of *Strickland* precludes a finding of ineffectiveness. *People v. Easley*, 192 Ill. 2d 307, 318 (2000).

¶ 49    In determining whether counsel's performance was objectively unreasonable, "[j]udicial scrutiny of an attorney's performance must be highly deferential, and a reviewing court will not inquire into areas that involve the exercise of discretion, judgment, or trial strategy." *People v. Valentine*, 299 Ill. App. 3d 1, 3 (1998) (citing *People v. Flewellen*, 273 Ill. App. 3d 1044, 1048 (1995)). As such, there is a strong presumption that counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Internal quotation marks omitted.) *People v. Brown*, 2023 IL 126852, ¶ 26. Defendant therefore must overcome the strong presumption that counsel's actions were a matter of sound trial strategy. *Strickland*, 466 U.S. at 689.

¶ 50    The State argues that counsel made a strategic decision to an "all or nothing" strategy rather than seek a severance. It further asserts counsel's decision was a matter of trial strategy where counsel's statements pretrial and during trial indicated that she anticipated defendant would testify at trial and thus knew other prior felonies could be presented to impeach defendant.

¶ 51    Defendant argues that none of counsel's statements prior to trial indicated that counsel knew defendant would testify, and because the court ruled on the State's motion *in limine* mid-trial, counsel's statements before this ruling only demonstrated that defendant was considering whether to testify before he knew how many prior convictions could be presented to the jury. Defendant further contends counsel's argument on the State's motion *in limine* demonstrates that

16

counsel did not consider severance of the charges where counsel argued the court should limit impeachment to one prior conviction considering there would be reference to the prior burglary conviction at trial. In support of his argument, defendant cites *People v. Utley*, 2019 IL App (1st) 152112. We find defendant is incorrect and his reliance on *Utley* misplaced.

¶ 52    As noted above, we presume counsel's actions—including a decision not to seek a severance—were a matter of trial strategy. *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 24; *People v. Poole*, 2012 IL App (4th) 101017, ¶ 10; *People v. Gapski*, 283 Ill. App. 3d 937, 942 (1996). Severance of charges could create a disadvantage in giving the State "two bites at the apple." *Poole*, 2012 IL App (4th) 101017, ¶ 10. A deficiency in the first case could be cured in the second case. *Id.* Thus, "[w]hen deciding whether to seek a severance, defense counsel may choose to pursue an 'all or nothing' trial strategy, in which the defendant is acquitted or convicted of all charges in a single proceeding." *Fields*, 2017 IL App (1st) 110311-B, ¶ 28.

¶ 53    Defendant's arguments fail to rebut the presumption that counsel's decision was a matter of trial strategy. The record shows that defendant was contemplating testifying until a final decision for the issue was made on the record. Counsel could also reasonably determine the likelihood of impeachment by prior convictions despite the court not definitely determining the issue. Regardless, defendant's decision to testify, and thus possibly be impeached with prior felony convictions, would not necessarily impact counsel's decision to proceed with an "all or nothing" strategy. Moreover, we fail to see how counsel's argument to limit impeachment to one prior felony conviction in light of the inevitable introduction of defendant's prior burglary conviction means counsel never considered severing the charges.

¶ 54    As noted above, we presume counsel here chose not to request a severance as a matter of trial strategy; moreover, the record also supports this presumption. The evidence for both the

17

aggravated discharge of a firearm and possession of a firearm and ammunition were intricately related. See *People v. Gapski*, 283 Ill. App. 3d 937, 944 (1996). Importantly, the asserted self-defense for the aggravated battery charge and defense of necessity for the unlawful possession charges depended on the same fact that defendant needed to possess and use the gun to protect himself. Given the circumstances, counsel may have believed that the odds of getting an acquittal for all charges in one proceeding were greater than receiving acquittals in multiple proceedings. *Fields*, 2017 IL App (1st) 110311-B, ¶ 28. The fact that an "all or nothing" strategy may have proved unwise in hindsight does not mean counsel provided ineffective assistance. *Id.*

¶ 55     We also find defendant's authority, *Utley*, distinguishable. In *Utley*, officers conducted a search of the defendant's home and found drugs in one closet in the master bedroom closet and various firearms and ammunition in another closet in the master bedroom. *Utley*, 2019 IL App (1st) 152112, ¶¶ 4-5. The defendant was ultimately convicted of multiple counts of possession of a controlled substance with intent to deliver, being an armed habitual criminal, and unlawful use of a weapon by a felon. *Id.* ¶ 24. The charges were tried together and at trial, the State admitted into evidence certified copies of the defendant's prior convictions for aggravated battery with a firearm and unlawful delivery of a controlled substance. *Id.* ¶ 15. On appeal, the defendant argued trial counsel was ineffective for failure to move to sever the gun charges from the drug charges. *Id.* ¶ 35. The appellate court agreed. *Id.* ¶¶ 49-50. In doing so, it noted that a previous case from the same appellate district stated, " 'Generally, a defense decision not to seek a severance, although it may prove unwise in hindsight, is regarded as a matter of trial strategy.' " *Id.* ¶ 43 (quoting *People v. Fields*, 2017 IL App (1st) 110311-B, ¶ 24). However, the *Utley* court distinguished the previous case where nothing in the record suggested trial counsel made a strategic decision, and the State failed to "identify any particular 'strategy' that was served by a decision not to move to

18

sever." *Id.* ¶ 48. It further noted that counsel did not minimize the prejudice to defendant by filing a motion *in limine* or by offering to stipulate to the predicate felonies. *Id.*

¶ 56    We question whether *Utley* adhered to the presumption that counsel's decision was a matter of trial strategy; regardless, we need not make such determination here, as there is a notable difference with the instant case. Not only do we presume counsel did not request severance based on trial strategy, the State here identified that an "all or nothing" strategy was served by counsel's decision not to move to sever the charges. Given the evidence required to prove the charges and the asserted defenses, we do not find such strategy fell below reasonable professional judgment.

¶ 57    Accordingly, we hold defendant failed to prove counsel's representation fell below an objective standard of reasonableness. Because defendant failed to establish the first prong of *Strickland*, we need not address prejudice.

¶ 58                                        III. CONCLUSION

¶ 59    Because defendant failed to establish counsel provided deficient representation, he failed to prove his ineffective assistance of counsel claim. Accordingly, we affirm.

¶ 60    Affirmed.